James W. BROOKS, former Commissioner of the Alaska Department of Fish and Game, Joel Bennett, former member of the Alaska Board of Game, and Wolf Management Reform Coalition, Appellants,

v.

Patrick WRIGHT, Albert W. Franzmann, Alaska Fish and Wildlife Conservation Fund, and Scientific Management of Alaska's Resource Treasures, Appellees.

State of Alaska, Office of the Governor of the State of Alaska, Lieutenant Governor, Fran Ulmer, Appellant,

v.

Patrick Wright, Albert W. Franzmann, Alaska Fish and Wildlife Conservation Fund, and Scientific Management of Alaska's Resource Treasures, Appellees.

Nos. S–8676, S–8685.

Supreme Court of Alaska.

Jan. 15, 1999.

Douglas Pope, Pope & Katcher, Anchorage, for Appellants James Brooks, Joel Bennett and Wolf Management Reform Coalition.

Kathleen Strasbaugh, Assistant Attorney General, and Bruce M. Botelho, Attorney

General, Juneau, for Appellant State of Alaska.

Arthur S. Robinson, Robinson, Beiswenger & Ehrhardt, Soldotna, and Brent Cole, Marston & Cole, P.C., Anchorage, for Appellees.

Michael A. Grisham, James N. Reeves, Bogle & Gates, P.L.L.C., Anchorage, for Amicus Curiae Alaska Wildlife Alliance.

Before MATTHEWS, Chief Justice, COMPTON, EASTAUGH, FABE, and BRYNER, Justices.

## OPINION

FABE, Justice.

### I. INTRODUCTION

Various citizens and community organizations sought to remove from the ballot an initiative prohibiting use of snares to trap wolves. The superior court agreed to decertify the initiative, reasoning that the initiative process is "clearly inapplicable" to natural resource management under Article XII of the Alaska Constitution because the state's role as "trustee" over natural resources gives it exclusive law-making powers over natural resource issues. After concluding that the prohibition of wolf snare traps is an appropriate subject for initiative, we reversed the superior court's order and placed the initiative back on the November 1998 general election ballot, announcing that an opinion would follow. Voters rejected the initiative in the November 1998 general election.

### II. FACTS AND PROCEEDINGS

In October 1997 Lieutenant Governor Fran Ulmer certified a ballot initiative which, if passed, would criminalize both the use of snares to trap wolves and the possession, sale, or purchase of wolf pelts known to have been taken by snare. The initiative, titled "An Act Relating to the Use of Snares in Trapping Wolves," reads in full:

BE IT ENACTED BY THE PEOPLE OF THE STATE OF ALASKA:

AS 16.05 is amended by adding a new section to read:

Section 16.05.784. PROHIBITED METHODS OF TRAPPING WOLVES.

(a) A person may not use a snare with the intent of trapping a wolf.

(b) A person may not possess, purchase, offer to purchase, sell, or offer to sell the skin of a wolf known by the person to have been caught with a snare.

(c) A person who violates this section is guilty of a Class A misdemeanor.

One month later, a group of two citizens and two community organizations (Wright)[1] filed suit against the State challenging the constitutionality of the initiative. Wright argued that, by virtue of the state's role as trustee over Alaska's natural resources under Article VIII, the legislature has exclusive law-making power with respect to wildlife management issues.

Wright had filed a previous suit against the State challenging a separate initiative that prohibited same-day airborne hunting of certain wildlife. Several proponents of the airborne hunting initiative (Brooks)[2] intervened in that suit. Brooks also filed briefs in this appeal. In December 1997 Superior Court Judge Ralph R. Beistline consolidated the wolf snare suit with the airborne hunting suit.

Although Judge Beistline ruled that the challenge to the airborne hunting initiative was untimely because the initiative had already become law, he barred placement of the wolf snare initiative on the 1998 general election ballot. Relying on Justice Compton's concurrence in *Pullen v. Ulmer*,[3] Judge Beistline reasoned:

---

1. The four plaintiff-appellees in this case are: Patrick Wright, a member of the Anchorage Fish and Game Advisory Committee; Albert Franzmann, a past member of the Alaska Board of Game; the Alaska Fish and Wildlife Conservation Fund; and Scientific Management of Alaska's Resource Treasures (SMART).

2. Intervenor-appellants include James Brooks, a former commissioner of the Alaska Department of Fish and Game; Joel Bennett, a former member of the Alaska Board of Game; and the Wolf Management Reform Coalition.

3. 923 P.2d 54, 65–66 (Alaska 1996) (Compton, J., concurring).

It would be inappropriate to dictate to the legislature the method or tool it should use to manage wildlife. The effect of such restrictions would be to infringe upon the legislature's exclusive right to manage wildlife resources and would compromise the legislature's ability to fulfill its trust obligation to preserve Alaska's fish and wildlife for the common use of all Alaskans.

The State appealed the superior court's ruling on the wolf snare initiative. On June 2, 1998, we issued an order to expedite the appeal. On August 17, 1998, after hearing oral arguments in the case, we reversed the superior court's ruling and vacated the injunction, thereby placing the wolf snare initiative back on the ballot. We stated in our order that an opinion of the court would follow. In the November general election the voters rejected the initiative.

### III. *STANDARD OF REVIEW*

█ This appeal centers around the constitutionality of using the initiative process to prohibit wolf snare traps. We review such questions of law de novo, applying our independent judgment and "adopt[ing] the rule of law which is most persuasive in light of precedent, reason, and policy."[4]

█ When reviewing initiative challenges, we liberally construe constitutional provisions that apply to the initiative process.[5] Specifically, we narrowly interpret the subject matter limitations that the Alaska Constitution places on initiatives.[6] Still, we have a duty to give questions involving the propriety of an initiative's subject matter "careful consideration because the constitutional right of di-

rect legislation is [also] limited by the Alaska Constitution."[7]

█ Pre-election review of challenges to ballot initiatives is limited to ascertaining "whether [the initiative] complies with the particular constitutional and statutory provisions regulating initiatives."[8] But "[g]eneral contentions that the provisions of an initiative are unconstitutional are justiciable only after the initiative has been enacted by the electorate."[9] Hence, our review of the initiative at this stage is limited to whether the subject matter is constitutionally permissible.

### IV. *DISCUSSION*

█ Articles XI and XII are the only provisions of the Alaska Constitution that explicitly mention the initiative process. Article XII describes when the people of Alaska may use the initiative to propose and pass legislation:

> LAW–MAKING POWER.... Unless *clearly inapplicable*, the law-making powers assigned to the legislature may be exercised by the people through the initiative, subject to the limitations of Article XI.[10]

In turn, Article XI imposes certain subject matter restrictions on initiatives:

> SECTION 7. RESTRICTIONS. The initiative shall not be used to dedicate revenues, make or repeal appropriations, create courts, define the jurisdiction of courts or prescribe their rules, or enact local or special legislation.[11]

Wright does not claim on appeal that the wolf snare initiative falls within one of the

---

**4.** *Ford v. Municipality of Anchorage*, 813 P.2d 654, 655 (Alaska 1991) (citing *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

**5.** *See Interior Taxpayers Ass'n, Inc. v. Fairbanks North Star Borough*, 742 P.2d 781, 782 (Alaska 1987).

**6.** *See Citizens' Coalition for Tort Reform v. McAlpine*, 810 P.2d 162, 168 (Alaska 1991) ("[T]he law-making powers *assigned to the legislature* are to be liberally construed as within the people's right to legislate by initiative.").

**7.** *Pullen v. Ulmer*, 923 P.2d 54, 58 (Alaska 1996) (quoting *Fairbanks v. Convention & Visitors Bureau*, 818 P.2d 1153, 1155 (Alaska 1991)).

**8.** *Boucher v. Engstrom*, 528 P.2d 456, 460 (Alaska 1974), *overruled in part on other grounds*, *McAlpine v. University of Alaska*, 762 P.2d 81 (Alaska 1988).

**9.** *Id.* at 460 n. 13.

**10.** Alaska Const. art. XII, § 11 (emphasis added).

**11.** Alaska Const. art. XI, § 7.

enumerated Article XI limitations.[12] Rather, he only argues that, under Article XII, the initiative process is "clearly inapplicable" to natural resource management decisions because of the state's role as trustee over wildlife and other natural resources. We first discuss whether wildlife management is "clearly inapplicable" to the initiative process based on the language and framers' understanding of Articles XI and XII. We then address whether the state's trustee-like duty set forth in Article VIII implies that the public may not propose initiatives relating to wildlife management.

A. *Whether Wildlife Management Is "Clearly Inapplicable" to the Initiative Process Based on the Language and History of Articles XI and XII*

To determine whether the subject matter of wildlife management is clearly inapplicable to the initiative process, we look first to the language and history of the constitutional provisions regarding the initiative process.

██ ██ We apply basic rules of statutory construction when interpreting the Alaska Constitution.[13] When construing constitutional provisions, we use our independent judgment, "adopting a reasonable practical interpretation in accordance with common sense based upon the plain meaning and purpose of the provision[s] and the intent of the framers." [14] We also "look to the meaning that the voters would have placed on [the] provision." [15] Although the restrictions included in Article XI are relatively straightforward and easy to decipher, the meaning of

the phrase "clearly inapplicable" in Article XII is less obvious. We therefore look to the intent of the framers for guidance in interpreting the provision.

The debates about the initiative process at the Alaska Constitutional Convention make clear the framers' understanding of the phrase "clearly inapplicable" in Article XII. During the discussion of what is now Article XII, § 11, Delegate George McLaughlin, chair of the Judiciary Committee and author of the proposed language, explained that use of the phrase "the legislature" in an article marked the delegates' intent to make the article subject to the initiative process as well:

> What do I mean here by "unless clearly inapplicable"? . . . Certainly we wouldn't intend, where you read in the article on the judiciary that the supreme court may adopt rules which may be, in substance, disapproved by two-thirds of each house of the legislature, because it was obviously meant from that context that that couldn't be subject to the initiative, and so we are clearly indicating here that *where we use the expression "by the legislature" or the expression "the legislature" we mean completely, thoroughly, and wholeheartedly know that it is subject not only to the initiative but to the referendum, and where it is clearly inapplicable, even 55 idiots would agree that it was inapplicable.*[16]

The convention adopted McLaughlin's proposed language shortly after he gave this speech.[17]

---

12. At no stage of this case has any party argued that the wolf snare initiative makes or repeals an appropriation in violation of Article XI, § 7. As Judge Beistline wrote:

> [N]or did [the parties] address the issue of whether or not an initiative addressing methods of wildlife management or harvest, such as the use of snares, would constitute an appropriation of state assets. . . .

Indeed, Wright himself acknowledges that:

> While an argument can be made that the establishment of laws involving means and methods of game harvest may effectively result in an appropriation of state assets, . . . Wright argues here, as he did in the superior court, that the subject of the wolf snare initiative is clearly inapplicable. . . .

The question is therefore not properly before us, and we do not address it here.

13. *See Thomas v. Bailey*, 595 P.2d 1, 4 (Alaska 1979).

14. *Cissna v. Stout*, 931 P.2d 363, 366 (Alaska 1996) (citation omitted).

15. *Division of Elections v. Johnstone*, 669 P.2d 537, 539 (Alaska 1983) (citation omitted).

16. *See* 4 Proceedings of the Alaska Constitutional Convention (PACC) 2849 (January 21, 1956) (emphasis added).

17. *See id.* at 2850–51.

Delegate Victor Fischer, in response to a motion to make "the legislature" signify *exclusively* the legislature, argued that such an interpretation would leave "hidden meanings" in the constitution that would limit the people's legitimate use of the initiative:

> I don't think it is right for us as an afterthought to start going through the whole constitution and add additional items that are not subject to the initiative.... If you believe that certain items should be exempted let's put them into Section 5 of Article 3 [later renumbered as art. XI, § 7] and specifically exempt them from the initiative instead of going through each article, section by section, and *by hidden meanings prevent the people from exercising the initiative.*[18]

Shortly after Fischer's speech, the motion to narrow the intended meaning of the term "the legislature" was defeated by a 2–1 margin.[19]

The framers chose to use the phrase "the legislature" in Article VIII, which concerns natural resource management:

> GENERAL AUTHORITY. *The legislature* shall provide for the utilization, development, and conservation of all natural resources belonging to the State, including land and waters, for the maximum benefit of its people.[20]

Such language evidences the delegates' intent that natural resource issues would be subject to the initiative. Indeed, unlike the Judiciary Committee,[21] the Resources Committee made no effort to have the subject matter of Article VIII excluded from the initiative process. If we were to grant the legislature an exclusive right to propose wildlife legislation based on the state's role as "trustee" over wildlife under Article VIII, we would be relying on the very hidden meanings against which Fischer warned and that the delegates at the constitutional convention squarely rejected.

Even if Article VIII had not contained the words "the legislature," the subject of wildlife management is not so clearly inapplicable to the initiative process as to pass Delegate McLaughlin's "55 idiot" test. The convention debates suggest the framers added "clearly inapplicable" to Article XII so that the initiative would not replace the legislature where the legislature's power serves as a check on other branches of government, such as legislative power to define courts' jurisdiction or override judicial rules.[22] This separation-of-powers concern does not exist with respect to natural resource issues under Article VIII. Hence, the debates do not support an interpretation of Article XII that would grant the legislature *exclusive* law-making powers over natural resource management on the grounds that such subject matter is "clearly inapplicable" to the initiative process.

Wright argues that natural resources issues are "sensitive and sophisticated" in Alaska, and therefore should be free from the "impulsive enactment of laws by the general public." He points to resolutions passed by the legislature and Game Board endorsing snare trapping as evidence that the initiative is ill-conceived. We agree with Wright that such issues are sensitive and complex; indeed, "public policy stakes are usually high" in initiative law.[23] But the framers of the constitution chose to include the initiative process as a law-making tool with full knowledge of the risks inherent to direct democracy.[24] And the public's disagreement with

**18.** *Id.* at 2837 (emphasis added).

**19.** *See id.* at 2841.

**20.** Alaska Const. art. VIII, § 2 (emphasis added).

**21.** *See* 4 PACC at 2843–46 (January 21, 1956).

**22.** *See, e.g.,* PACC at 2848–49 (January 21, 1956) (statement of Del. McLaughlin) (stating that initiative should not be used to override judicial rules); *id.* at 2821 (statement of Del. Davis) (defining the jurisdiction of courts); *id.* at 2836–37 (statement of Del. Rivers) (changing fundamental aspects of the judiciary as defined in the constitution). *See also Citizens' Coalition for Tort Reform*

*v. McAlpine,* 810 P.2d 162, 168 (Alaska 1991) (invalidating an initiative to limit attorney contingency fees because "[o]nly the law-making powers *assigned to the legislature* " are within the right to legislate by initiative).

**23.** M. Katheryn Bradley & Deborah L. Williams, *"Be It Enacted by the People of the State of Alaska ..."—A Practitioner's Guide to Alaska's Initiative Law,* 9 Alaska L.Rev. 279, 302 (1992).

**24.** *See Thomas v. Bailey,* 595 P.2d 1, 8 (Alaska 1979) ("The restrictions on permissible subjects for direct legislation represent a recognition ... that certain particularly sensitive or sophisticat-

legislative and administrative officials can just as easily be taken as evidence of the appropriate use of the initiative process. Additionally, safeguards exist in the process, allowing the legislature to repeal initiated legislation after two years and to amend such legislation at any time.[25] Concerned parties can also bring a post-election substantive challenge to what they may believe is an ill-advised law. As the Alaska Wildlife Alliance (AWA) points out, if any specific initiated law is "constitutionally infirm," it can be invalidated on that basis.[26]

Finally, the delegates' decision to submit Ordinance 3, which banned commercial salmon traps, for voter ratification along with the rest of the constitution evidences the delegates' and voters' understanding that wildlife management issues would be subject to direct democracy. The wording of the referendum submitted to the people emphasized the public's role in the decision to abolish fish traps:

> As a matter of immediate public necessity, to relieve economic distress among individual fishermen and those dependent upon them for a livelihood, to conserve the rapidly dwindling supply of salmon in Alaska, to insure fair competition among those engaged in commercial fishing, and *to make manifest the will of the people of Alaska*, the use of fish traps for the taking of salmon for commercial purposes is hereby

prohibited in all the coastal waters of the State.[27]

Those delegates opposed to submitting the ordinance to the voters argued that the matter should be resolved by future state legislative action rather than by popular vote.[28] A motion to this effect was defeated by a 42–12 vote.[29] After ratification, we held that Ordinance 3 was a valid modification of the territorial laws.[30] We viewed Ordinance 3, and by implication the process through which it was adopted, as being consistent with the state's management responsibilities for wildlife and other "property of the state, held in trust." [31]

Thus the language and framers' understanding of Articles XI and XII, along with the chosen wording of Article VIII and the inclusion of Ordinance 3 for ratification, suggest that natural resource management is not, as Wright contends, "clearly inapplicable" to the initiative process.

B. *Whether the Legislature Has Exclusive Law–Making Powers over Wildlife Management by Virtue of the State's Trustee–Like Duties under Article VIII*

Article VIII of the Alaska Constitution concerns the management of natural resources:

SECTION 3. COMMON USE. Wherever occurring in their natural state, fish, wild-

---

ed areas of legislation should not be exposed to emotional electoral dialogue and impulsive enactment by the general public.") (internal citation omitted).

**25.** *See* Alaska Const. art. XI, § 6.

**26.** *See also Owsichek v. State, Guide Licensing & Control Bd.*, 763 P.2d 488, 494–96 (Alaska 1988) (invalidating board's establishment of guide areas for hunting as violative of Article VIII's public use clause).

**27.** Alaska Const. ord. III, § 2 (emphasis added).

**28.** *See* 5 PACC at 3564–3752 (January 30, 1956).

**29.** *See id.* at 3572.

**30.** *See Metlakatla Indian Community, Annette Island Reserve v. Egan*, 362 P.2d 901, 922–23 (Alaska 1961), *vacated on other grounds*, 369 U.S. 45,

82 S.Ct. 552, 7 L.Ed.2d 562 (1962), *aff'd sub nom. Organized Village of Kake v. Egan on other grounds*, 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962).

**31.** *Id.* at 915. One could argue that regulation of salmon traps is an allocation of resources, given that the purpose of the ordinance was to give individual commercial Alaska fishermen greater access to the salmon population. *See* 5 PACC at 3564–71 (January 30, 1956); Alaska Const. ord. III, § 2. This argument was not made by opponents of Ordinance 3, nor was it made by Wright in this case with respect to the wolf snare initiative. Moreover, the wolf snare initiative, the main purpose of which is presumably to prevent cruelty to animals, does not present the same opportunity or motive for self-dealing as did Ordinance 3. In any event, such an argument does not diminish the persuasiveness of the Ordinance 3 example in countering Wright's public trust argument.

life, and waters are reserved to the people for common use.

SECTION 4. SUSTAINED YIELD. Fish, forests, wildlife, grasslands, and all other replenishable resources belonging to the State shall be utilized, developed, and maintained on the sustained yield principle, subject to preferences among beneficial uses.[32]

Wright argues that these clauses establish a "public trust" for management of the state's wildlife, with the State of Alaska as "trustee" and the people of Alaska as the intended beneficiaries. From this premise, Wright further claims that the state, as part of its fiduciary duty, retains exclusive law-making authority over natural resource issues. We disagree.

We have frequently compared the state's duties as set forth in Article VIII to a trust-like relationship in which the state holds natural resources such as fish, wildlife, and water in "trust" for the benefit of all Alaskans.[33] Instead of recognizing the creation of a public trust in these clauses per se, we have noted that "the common use clause was intended to engraft in our constitution certain trust principles guaranteeing access to the fish, wildlife and water resources of the state."[34]

We have applied the public trust doctrine to cases involving exclusive grants of natural resources by the state. In *CWC Fisheries, Inc. v. Bunker*,[35] we held that a holder of a state-granted fee interest in tidelands takes the land subject to a public easement.[36] We based our holding in part on the state's public trust responsibilities with respect to tideland conveyance,[37] but did not address whether Article VIII creates a public trust per se or whether such responsibilities preclude public participation in natural resource

management decisions. Furthermore, we suggested that expansion of the public trust doctrine to include all or most public uses merely because it has been applied to a particular public use would be inappropriate.[38]

A few months after *CWC Fisheries*, we clarified in *Owsichek v. State, Guide Licensing & Control Board* that the purpose of the public trust doctrine was not to *grant* the legislature ultimate authority over natural resource management, but rather to *prevent* the state from giving out "exclusive grants or special privilege as was so frequently the case in ancient royal tradition."[39] Hence, the State of Alaska acts as "trustee" over wolves and other wildlife not so much to avoid *public* misuse of these resources as to avoid the *state's* improvident use or conveyance of them.

Indeed, in *Owsichek*, after a discussion of the holding in *CWC Fisheries*, we emphasized that the state's duties with respect to natural resource management under Article VIII "[are] to be exercised like all other powers of government, ... and not as a prerogative for the advantage of the government as distinct from the people."[40]

Wright relies on a recent case, *Baxley v. State*,[41] to argue that we should apply basic principles of private trust law to the trust-like relationship described in Article VIII. In *Baxley*, we referred to the public trust doctrine in examining the propriety of four state oil leases in the Beaufort Sea:

The public trust doctrine provides that the State holds certain resources (such as wildlife, minerals, and water rights) in trust for public use and that government owes a fiduciary duty to manage such resources

**32.** Alaska Const. art. VIII, §§ 3, 4.

**33.** *See, e.g., McDowell v. State*, 785 P.2d 1, 18 (Alaska 1989); *Herscher v. State, Dep't of Commerce*, 568 P.2d 996, 1002–03 (Alaska 1977).

**34.** *Owsichek v. State, Guide Licensing & Control Bd.*, 763 P.2d 488, 496 (Alaska 1988).

**35.** 755 P.2d 1115 (Alaska 1988).

**36.** *See id.* at 1121.

**37.** *See id.* at 1118–19.

**38.** *See id.* at 1118 nn. 7–8.

**39.** *Owsichek v. State, Guide Licensing & Control Bd.*, 763 P.2d 488, 493 (Alaska 1988) (citing constitutional convention papers).

**40.** *Owsichek*, 763 P.2d at 494 (citation omitted).

**41.** 958 P.2d 422 (Alaska 1998).

for the common good of the public as beneficiary.[42]

Although we declined to address in *Baxley* whether the state had breached its fiduciary duty, we relied on another case, *State v. Weiss (Weiss I )*, in noting that we should apply "basic principles of trust law to public land trusts." [43]

But, unlike this case, *Weiss I* involved the state's duty as trustee over *expressly created* special purpose public land grants and leases.[44] In that case we stated:

> Our reliance upon basic trust law principles finds ample support in the precedents of this court and the United States Supreme Court. *See Lassen v. Arizona,* 385 U.S. 458, 87 S.Ct. 584, 17 L.Ed.2d 515 (1967); *State v. University of Alaska,* 624 P.2d 807 (Alaska 1981). Both *Lassen* and *University of Alaska* involved *federal grants to be used by states for school purposes.* Those cases stand for the proposition "that the same private trust law principles are to apply to *federal land granted to the states for school purposes.*" [45]

We have since emphasized that the applicability of private trust law depends greatly on both the type of trust created and the intent of those creating the trust. In *Weiss v. State (Weiss II )*,[46] involving the same grant lands as in *Weiss I,* we cautioned that "reliance [on principles of private trust law] does not imply that application of such principles yields the same result regardless of the nature of the trust at issue." [47]

*Baxley,* unlike *Weiss I,* did not involve an expressly created public land grant. Rather, *Baxley* simply relied on *Weiss I* to show that,

if Baxley had timely raised his public trust argument in the trial court, then questions of fact and law might exist as to whether the state breached its fiduciary duty. Wright relies on dicta in *Baxley* to argue that private trust law should be applied wholesale to the public trust doctrine. This result, however, would be an overbroad interpretation of our holdings in *Baxley* and *Weiss I.*

Moreover, application of private trust principles may be counterproductive to the goals of the trust relationship in the context of natural resources. For instance, private trusts generally require the trustee to maximize economic yield from the trust property, using reasonable care and skill.[48] But Article VIII requires that natural resources be managed for the benefit of all people, under the assumption that both development and preservation may be necessary to provide for future generations, and that income generation is not the sole purpose of the trust relationship.[49] And although trust law dictates that the acts of a trustee should be reviewed for abuse of discretion, we have held that grants of exclusive rights to harvest natural resources listed in the common use clause are subject to close scrutiny.[50] Private trust law principles also provide no guidance as to when the public's right to common use of resources can be limited through means such as licensing requirements.[51] Finally, exceptions do exist to the general principle that beneficiaries cannot dictate how to manage the trust property. For example, in some circumstances, the creator may provide for the beneficiary's participation in trust management,[52] and the bene-

---

**42.** *Id.* at 434 (citation and internal quotation marks omitted).

**43.** *Id.* (citing *State v. Weiss (Weiss I )*, 706 P.2d 681, 683 n. 3 (Alaska 1985)).

**44.** *See Weiss I,* 706 P.2d at 681–82.

**45.** 706 P.2d at 683 n. 3 (emphases added) (quoting *University of Alaska,* 624 P.2d at 813).

**46.** 939 P.2d 380 (Alaska 1997), *cert. denied,* — U.S. —, 118 S.Ct. 366, 139 L.Ed.2d 285 (1997).

**47.** *Id.* at 389.

**48.** *See* Restatement (Second) of Trusts §§ 174, 176, 181 (1959).

**49.** *See* Alaska Const. art. VIII, §§ 1, 4.

**50.** *See Owsichek v. State,* 763 P.2d 488, 494 (Alaska 1988).

**51.** *See id.* at 492 (noting that the common use clause does not prohibit all regulation of use of listed resources).

**52.** *See* Restatement (Second) of Trusts at § 37 cmt. b (1959) (creator may reserve for beneficiary the power to administer, revoke, or modify trust).

ficiary of a trust may act as trustee.[53]

Other jurisdictions have held that, while general principles of trust law do provide some guidance, they do not supercede the plain language of statutory and constitutional provisions when determining the scope of the state's fiduciary duty or authority.[54] One commentator notes that general trust law should not be applied to the public trust doctrine in a way that limits or destroys the democratic process: "It would be a strict violation of democratic principle for the original voters and legislators of a state to limit, through a trust, the choices of the voters and legislators of today." [55]

We most recently visited the public trust doctrine in the natural resource context in *Pullen v. Ulmer.*[56] In that case, we decertified an initiative allowing subsistence, personal use, and sport fisheries to have preference over other fisheries with respect to the harvestable salmon surplus.[57] We concluded that salmon should be considered "assets" of the state for purposes of carrying out the state's trust duties with respect to wildlife.[58] Because state assets may not be appropriated by initiative pursuant to Article XI,[59] and because we viewed the preferential treatment of certain fisheries over others as an appropriation,[60] we removed the initiative from the ballot. We left open the question of whether the state's trust responsibilities under Article VIII give the legislature exclusive law-making control over wildlife management.[61]

We find little support in the public trust line of cases for the proposition that the common use clause of Article VIII grants the legislature exclusive power to make laws dealing with natural resource management. Article VIII does not explicitly create a public trust; rather, we have used the analogy of a public trust to describe the nature of the state's duties with respect to wildlife and other natural resources meant for common use. Additionally, the wholesale application of private trust law principles to the trust-like relationship described in Article VIII is inappropriate and potentially antithetical to the goals of conservation and universal use. And in *Pullen,* the only case in which we discussed the initiative process, we declined to hold that the public trust doctrine gives the legislature exclusive law-making authority over the subject matter of Article VIII. We therefore reject Wright's argument to the contrary and decline to decertify the initiative on public trust grounds.

■ For these reasons, we conclude that the legislature does *not* have exclusive law-making powers over natural resources issues merely because of the state's management role over wildlife set forth in Article VIII of the Alaska Constitution, and therefore the wolf snare issue is *not* "clearly inapplicable" to the initiative process under Article XII.

## V. CONCLUSION

Pursuant to this court's August 17, 1998 order, the superior court's order on summary judgment is REVERSED and its injunction against placement of the proposed ballot measure, "An Act Relating to the Use of

**53.** *See id.* at §§ 99, 100.

**54.** *See, e.g., Evans v. City of Johnstown,* 96 Misc.2d 755, 410 N.Y.S.2d 199, 207–08 (N.Y.App.Div.1978) ("While the use of the name 'public trust' may suggest duties similar to those under a private trust, that interpretation is not feasible."); *City of Coronado v. San Diego Unified Port Dist.,* 227 Cal.App.2d 455, 38 Cal.Rptr. 834, 844 (Cal.Dist.App.1964) ("[P]rivate trust principles cannot be called upon to nullify an act of the legislature or modify its duty . . . .").

**55.** James L. Huffman, *A Fish Out of Water: The Public Trust Doctrine in a Constitutional Democracy,* 19 Envtl. L. 527, 544 (1989).

**56.** 923 P.2d 54 (Alaska 1996).

**57.** *See id.* at 55, 64–65.

**58.** *Id.* at 61.

**59.** *See id.* at 58.

**60.** *See id.* at 64.

**61.** *See id.* at 64 n. 18. Justice Compton concurred with our result in *Pullen,* disagreeing with our conclusion that salmon was a state "asset" and basing his decision instead on the Article VIII public trust argument. *See Pullen,* 923 P.2d at 65–66 (Compton, J., concurring).

Snares in Trapping Wolves," on the general election ballot is VACATED.