# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1999-CA-00912-SCT

*IN RE PROPOSED INITIATIVE MEASURE NO. 20: ELIZABETH STONER*

*v.*

*ROBERT MAHONEY, ODEAN REED, SHERWOOD R. BAILEY, JR., CHEVIS C. SWETMAN, CLAYTON HENDERSON, ERNEST J. STEBBINS, AND MISSISSIPPI GAMING ASSOCIATION, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/06/1999 |
| TRIAL JUDGE: | HON. JAMES E. GRAVES, JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | STEPHEN M. CRAMPTON |
| | MICHAEL JOSEPH DEPRIMO |
| ATTORNEYS FOR APPELLEES: | JOHN C. HENEGAN |
| | ROBERT L. GIBBS |
| | THOMAS H. WALMAN |
| | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MAUDINE G. ECKFORD |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 12/21/2000 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 1/11/2001 |

**EN BANC.**

**MILLS, JUSTICE, FOR THE COURT:**

¶1. On Court's own motion, the prior opinions issued in this case are withdrawn, and these opinions are substituted therefor.

## STATEMENT OF THE CASE

¶2. This is an appeal from the Circuit Court of the First Judicial District of Hinds County, Mississippi declaring Proposed Initiative Measure No. 20 (Measure No. 20) null and void. On May 7, 1999, the circuit court entered judgment determining that Measure No. 20 is unconstitutional because it impermissibly attempts to prohibit rights granted to the people of the State of Mississippi under the Bill of Rights of the Mississippi Constitution and fails to include a government revenue impact statement as required by Section 273 of the Mississippi Constitution. Additionally, it found that the doctrines of res judicata and collateral estoppel barred any further legal claims by the measure's sponsor since two prior measures involving the same subject matter have already been litigated. Aggrieved by the judgment of the circuit court, the sponsor of Measure No. 20, Elizabeth Stoner (Stoner), appeals to this Court assigning two points of error:

**1) Whether courts have jurisdiction over the merits of a proposed initiative to amend the Mississippi Constitution?**

**2) Whether the plaintiffs had standing to bring an action for declaratory judgment and other relief?**

## STATEMENT OF FACTS

¶3. On March 22, 1999, Elizabeth Stoner filed with the Secretary of State a proposed initiative measure to prohibit gambling within the state, except gambling sponsored by religious, educational or wildlife organizations. As required by Miss. Code Ann. § 23-17-5 (Supp. 1999), the Secretary of State delivered the proposal to the Attorney General. The Attorney General reviewed the measure for form and style and issued a certificate of review pursuant to section 23-17-7 (Supp. 1999). The Secretary of State subsequently assigned a serial number to the proposal. Initiative Measure No. 20 was born.

¶4. Thereafter, the Attorney General drafted a ballot title and summary for Measure No. 20, as required by section 23-17-9 (Supp. 1999), and sent it to the Secretary of State. The Secretary of State timely published the ballot title and summary pursuant to section 23-17-11 (Supp. 1999). Subsequently, Robert Mahoney, Odean Reed, Sherwood R. Bailey, Jr., Chevis C. Swetman, Clayton Henderson, Ernest J. Stebbins, Mississippi Gaming Association, Inc., Eric Clark, Secretary of State of the State of Mississippi and Michael C. Moore, Attorney General of the State of Mississippi (collectively "appellees"), filed their consolidated petition and complaint asking the circuit court to review and set aside Measure No. 20, alleging that the measure violates Section 273(4)-(5) of the Mississippi Constitution and its statutory equivalent, Section 23-17-1(3)(4) (Supp. 1999). These sections provide, in summary, (1) that if a proposed initiative requires a reduction in any source of government revenue the sponsor must include in the text of the initiative the programs whose funding will be affected and (2) that the initiative process shall not be used to modify or repeal any portion of the Bill of Rights of the Mississippi Constitution.

¶5. Initiative Measure No. 20 proposes to amend the State Constitution to prohibit all forms of gambling within the State of Mississippi except for "activities regulated under educational, wildlife conservation or religious organizations . . . ." The proposed measure provides that affected gaming establishments are subject to a "two year amortization period, at the conclusion of which all non-exempt . . . gaming . . . conducted in this State shall cease." This proposed initiative is Stoner's third attempt to exercise her right to propose a constitutional amendment making certain forms of gaming illegal in the State of Mississippi. The first two were Initiative Measures No. 12 and 13, filed on June 12, 1998 and July 10, 1998, respectively.

¶6. The appellees in this case also previously filed suit to have Initiative Measure No. 12 set aside, naming the State Attorney General, the Secretary of State, and Stoner as respondents to the petition and the Secretary of State and Stoner as defendants to the complaint. The Circuit Court of the First Judicial District of Hinds County ruled in 1998 that Initiative Measure No. 12 was unconstitutional because it violated the state Constitution's Bill of Rights and failed to include a government revenue impact statement as required by section 273(4) of the Mississippi Constitution and Miss. Code Ann. § 23-11-1(3) (Supp. 1999). As a result, the circuit court found Measure No. 12 to be legally insufficient; rendered it null and void; and declared that the ballot title and summary could not be finally established.

¶7. Stoner collaterally attacked the circuit court's order disposing of Measure No. 12 by filing an emergency petition for writ of mandamus in this Court. Stoner argued that the circuit court had no

jurisdiction to enter a ruling addressing the content or subject matter of her proposed measure and that the appellees lacked standing. We dismissed the petition, holding that the circuit court's order was a final judgment under Miss. Code Ann. § 11-51-3 (Supp. 1999) and that, therefore, "the proper mode of review . . . is by way of direct appeal, and not by writ of mandamus." *In re Stoner*, No. 1998-M-00945 (Miss. Oct. 14, 1998) Stoner did not take a direct appeal from the circuit court's July 24, 1998, order.

¶8. On July 10, 1998, Stoner filed her second anti-gaming initiative, subsequently designated Initiative Measure No. 13. Appellees again timely filed their suit to have Measure No. 13 set aside. The circuit court found that Measure No. 13 shared the constitutional infirmities of Measure No. 12; i.e., it impermissibly attempted to amend the state constitution's Bill of Rights and failed to include a governmental revenue impact statement. Further, the circuit court held that the doctrines of res judicata and collateral estoppel precluded Stoner from relitigating the same issues addressed by the circuit court's first order because Measure No. 13 was nearly identical to Measure No. 12.

¶9. Stoner did not appeal the circuit court's second order but instead filed her third anti-gaming proposal, dated March 22, 1999. As noted, this proposal was designated as Initiative Measure No. 20. This measure suffered the same fate as the previous two. Appellees filed suit to have Measure No. 20 set aside, and Stoner answered citing lack of jurisdiction and lack of standing. The circuit court again held that the anti-gaming initiative impermissibly attempted to amend the Bill of Rights and failed to include a government revenue impact statement. (The court below failed to identify which part of the Bill of Rights was being impermissibly amended. We see no impingement. Accordingly, the circuit court's ruling in that regard will be treated as mere surplusage affecting neither Stoner's assignments of error nor appellees' rights on appeal.). Additionally, the circuit court held that the doctrines of res judicata and collateral estoppel precluded Stoner from relitigating the issues based on the two previous judgments setting aside Stoner's two prior anti-gaming measures. From the order dated May 6, 1999, Stoner appeals to this Court.

## ANALYSIS

¶10. The Mississippi Constitution places certain guidelines and limitations upon the use of the initiative process. Article 15, Section 273(3) reads:

> The people reserve unto themselves the power to propose and enact constitutional amendments by initiative. An initiative to amend the Constitution may be proposed by a petition signed over a twelve-month period by qualified electors equal in number to at least twelve percent (12%) of the votes for all candidates for Governor in the last gubernatorial election. The signatures of the qualified electors from any congressional district shall not exceed one-fifth ( 1/5 ) of the total number of signatures required to qualify an initiative petition for placement upon the ballot. If an initiative petition contains signatures from a single congressional district which exceed one-fifth ( 1/5 ) of the total number of required signatures, the excess number of signatures from that congressional district shall not be considered by the Secretary of State in determining whether the petition qualifies for placement on the ballot.

Miss. Const. art. 15, § 273(3).

¶11. A sponsor of an initiative must also disclose certain budget information as set forth in section 273(4) of the state Constitution:

The sponsor of an initiative shall identify in the text of the initiative the amount and source of revenue required to implement the initiative. If the initiative requires a reduction in any source of government revenue, or a reallocation of funding from currently funded programs, the sponsor shall identify in the text of the initiative the program or programs whose funding must be reduced or eliminated to implement the initiative. Compliance with this requirement shall not be a violation of the subject matter requirements of this section of the Constitution.

Miss. Const. art. 15, § 273(4), *codified in* Miss. Code Ann. § 23-17-1(3)-(4).

¶12. We must determine whether these constitutional provisions have been satisfied here.

### 1) Whether courts have jurisdiction over the merits of a proposed initiative to amend the Constitution?

¶13. Whether the circuit court had jurisdiction to hear a particular matter is a question of law. We must therefore apply a de novo standard of review to this issue. ***Wright v. White***, 693 So.2d 898, 900 (Miss.1997).

¶14. Stoner contends that the circuit court exceeded its subject matter jurisdiction when it assumed jurisdiction over the appellees' complaint to have Measure No. 20 set aside. ("Circuit court" means the Circuit Court of the First Judicial District of Hinds County, for this is the circuit court expressly authorized to hear matters regarding the initiative process. See Miss. Code Ann. § 23-17-13 (Supp. 1999)). Stoner contends that section 156 of the state Constitution conferring original jurisdiction in the circuit courts "in all matters civil and criminal in this state not vested by this Constitution in some other court, and such appellate jurisdiction as shall be prescribed by law" does not extend to matters touching the initiative process. Stoner argues that under Mississippi law the phrase "original jurisdiction in all matters civil" is "confined to matters which were of a common law nature, that is, to matters which were known at common law." ***Wheeler v. Shoemake,*** 213 Miss. 374, 400, 57 So.2d 267, 279 (1952).

¶15. Apparently, Stoner's argument hinges on the negative inference that since § 23-17-13 refers to the "ballot title and summary," the circuit court has no jurisdiction over any other matters concerning the initiative process. Therefore, she concludes, the circuit court has no jurisdiction to review a proposed measure's constitutional compliancy. Of course, this contention flies directly in the face of Section 156's grant of "jurisdiction in all matters civil and criminal in this state not vested by this Constitution in some other court . . . ." Stoner's contention that our decision in ***Wheeler*** should be applied in her favor here is without merit. ***Wheeler*** dealt with the Legislature's power to classify certain criminal matters as non-criminal. Section 23-17-13 deals merely with the legislature's authority to direct venue , not jurisdiction. The legislature has chosen to direct all matters concerning the initiative process to the Circuit Court of the First Judicial District of Hinds County. The statute merely directs venue, not jurisdiction. Jurisdiction is conferred upon the circuit courts by Section 156. Venue is selected by § 23-17-13. If we were to follow Stoner's suggestion, we would be left with no place or procedure by which to review the constitutionality of a proposed initiative (i.e., whether it is constitutional on its face or satisfies the conditions and requirements as set forth in section 273 of the Constitution) before the initiative petition is either circulated among the voters for signatures or before it is placed on the ballot for consideration by the people in a general election. Stoner argues that the proper and only time that the courts may review the constitutionality of a proposed initiative is *after* the electoral die is cast in a general election. In effect, she argues for unbridled ballot box chaos. This argument runs counter to all notions of ballot box efficiency and notice to the electorate.

¶16. We hold today that §§ 23-17-1 et seq. do not divest the Circuit Court of the First Judicial District of Hinds County of its jurisdiction as set forth in section 156 of the Constitution. As such, this circuit court is the proper venue and has jurisdiction to review the facial constitutionality of proposed initiatives.

¶17. Stoner next suggests that section 23-17-23 illustrates only the purely procedural nature of the entire initiative and referendum scheme and contends that a proposed initiative is not subject to any substantive review by the courts. It is true that proposed initiatives will not be reviewed by this or any other court for their wisdom and merit. ***Power v. Ratliff***, 112 Miss. 88, 72 So. 868 (1916). The voters make those decisions. However, proposed initiatives are subject to review of form and, therefore, content inasmuch as content affects form and form affects content. Simply put, initiatives must meet minimum constitutional and statutory requirements, prior to being placed on the ballot to ensure full disclosure and notice to the electorate.

¶18. Section 273(4) of the state Constitution calls for the sponsor of any proposed initiative to include within that initiative a government revenue impact statement. Specifically, section 273 requires that if the implementation of the initiative "requires a reduction in *any* source of government revenue, the sponsor shall identify in the text of the initiative the program or programs whose funding must be reduced or eliminated . . . ." (emphasis added). Miss. Const. art. 15, § 273(4). Section 5 of Initiative Measure No. 20 reads: "This initiative measure requires no reduction in any source of government revenue, nor a reallocation of funding from currently funded programs." Stoner supports this bold assertion by arguing that the ceasing of all for-profit gaming in the state of Mississippi will "not necessarily require" a reduction in any source of government revenue. Whether or not one supports legal gaming, a fair-minded student of Mississippi government must reach the inarguable conclusion that legalized gaming has become an important generator of tax revenue in the state of Mississippi. Since the inception of for-profit gaming in this state in March of 1993 through February of this year, the total tax revenue generated by for-profit gaming amounts to over $1.3 billion. Mississippi State Tax Commission, Miscellaneous Tax Division, "Mississippi Tax Revenues from Gaming" (July 19, 2000). This money has been used to make much needed improvements in numerous areas of our state including, but certainly not limited to, our highways and schools. Stoner's assertion that Measure No. 20 would not necessarily adversely affect the tax revenue of this state is patently unreasonable. The government revenue impact statement is a requirement designed to protect the integrity of the constitutional initiative process and to prevent the electors of this state from being presented with false and misleading initiative petitions. The people are entitled to the best, most accurate information available when voting on matters of state. When a sponsor of an initiative asserts that the initiative will have no negative impact on current funding of state programs and chooses to exclude a government revenue impact statement from the text of the initiative, that sponsor must establish a rational basis to support her assertion that no such adverse impact will occur. Initiative Measure No. 20 does not include a government revenue impact statement. Stoner has established no rational basis for her assertion that her proposed measure to eliminate for profit gaming will not necessarily require an adverse impact on government revenue in this state. This constitutional deficiency clearly violates section 273(4) of the state Constitution. The order of the circuit court declaring Measure No. 20 unconstitutional and therefore null and void is affirmed.

**2) Whether Plaintiffs/Appellees had standing to bring an action for declaratory judgment other or relief?**

¶19. Stoner's second primary contention is that the appellees lacked standing to assert the claims set forth in

their complaint. In *Power v. Robertson*, 130 Miss. 188, 93 So. 774, 769 (1922) this Court specifically addressed the standing issue with respect to the initiative process. *Id*. We stated:

> The initiative proceeding, reserving the legislative power in the people, makes each elector, if the amendment is valid, a part of the legislative machinery, and with rights as such in the enactment and proposal of legislation. The people who oppose the measure in our opinion have equal rights with those who favor the measure. This is a more reasonable construction, as well as a more just one, than it would be to hold that a part of the electorate would be to hold that a part of the electorate would have a right to propose a measure which the other part did not have a right to oppose . . . We think, in dealing with the subject, that a distinction must be drawn between elections ordered by law at fixed times and places, or an election ordered by the Legislature without conditions precedent, and those elections that can only be held when certain conditions have come into existence.

*Id.* at 773.

¶20. As qualified electors and taxpayers of the State of Mississippi, the appellees in this case had standing to assert their claims questioning the sufficiency of Initiative Measure No. 20. This argument is without merit.

## CONCLUSION

¶21. Section 273 of the Mississippi Constitution seeks to temper the initiative induced tension between the unchecked will of the majority versus the inherent rights of individuals. The section protects the Bill of Rights and other matters of state interest; seeks to protect the state coffers by requiring rationally based government revenue statements; and seeks to discourage regionalism by requiring broad-based support for any proposed initiative.

¶22. Finally, the initiative movement of recent experience, both in Mississippi and other states, has exposed the danger that special interests can easily manipulate and control the initiative process in states lacking responsible procedural guidelines in their initiative laws. Care must be taken to ensure that the rights of individuals, minorities, and separate regions of the state are not easily trampled and ignored by majority impulses. Section 273 provides reasonable checks against such abuses. It is our duty to apply these factors fairly and evenly.

¶23. For the foregoing reasons, the judgment of the circuit court finding Initiative Measure No. 20 unconstitutional and therefore null and void is affirmed.

¶24. **AFFIRMED**.

> **PRATHER, C.J., PITTMAN AND BANKS, P.JJ., McRAE AND WALLER, JJ., CONCUR. DIAZ, J., CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY BANKS, P.J. AND McRAE, J. COBB, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SMITH, J.**

> **DIAZ, JUSTICE, CONCURRING:**

¶25. I concur with the majority opinion that the judgment of the trial court should be affirmed. I write separately to address the dissenting opinion that proffers the untenable suggestion that Stoner's revenue

impact statement was valid as filed.

¶26. The dissent suggests that the quoted paragraphs four (4) and five (5) in its opinion satisfy the statute's call for a revenue impact statement due in part to the on-going public debate surrounding the cost/benefit analysis of gambling in Mississippi. I disagree. Even the most cursory glance at the numbers indicating the economic impact the gaming industry has had and continues to make on state and local government revenues shakes the unsteady ground upon which the dissent has firmly planted itself.

¶27. The dissent cites a 1995 law journal article which lists several negative economic impacts, leading the reader to believe that the article points to these financial repercussions as credible support for Stoner's position. A careful reading of the direct quote in the article reveals otherwise:

> To a certain extent, these negative economic impacts are nothing more than natural market adjustments to the birth of a new and vigorous industry in the state. It is now harder to hire people to build homes in the state, but one can hardly complain about full employment in the construction industry. Similarly, it is hard to feel bad about casinos hiring people at good salaries and thereby driving up the cost of labor for other employers. If rental prices are artificially high in some areas today construction will eventually meet the demand and prices will come back down. If certain industries are now less profitable, that is just a reflection of the market at work. These adjustments are simple economic growing pains, inconvenient and undesirable to those who are directly impacted, *but not a valid basis for challenging the gaming industry*. Social issues, however, are an altogether different matter.

Ronald J. Rychlak, *The Introduction of Casino Gambling: Public Policy and the Law,* 64 Miss. L.J. 291, 332 (1995) (emphasis added).

¶28. There is much academic wrangling that rages on both sides of the legalized gambling debate concerning the social cost of gambling versus the economic benefit of the industry. That, however, is not the issue before us today. It is the province of the Legislature to address the various public policy issues interwoven in the financial fabric of the gaming industry. Thus, the focal point of this inquiry is economic only; specifically Stoner's assertion in her revenue impact statement that the "initiative requires no reduction in any source of government revenue." No statement could be further from the truth.

¶29. In a recent study entitled "Fiscal Year 1999 Economic Impact for Tourism and Recreation in Mississippi,"[1] several important statistics are presented that reflect the enormity of the economic boost the gambling industry gives to both state and local governments. Gross gaming revenues surpassed the $2.3 billion mark in fiscal year (FY) 1999, a 12.2 percent increase over the $2.1 billion reaped in FY 1998. Total gaming-related tax revenues for Mississippi climbed 12.4 percent from $250.4 million in FY 1998 to $281.5 million in FY 1999. From this amount, local governments benefitted from $82.9 million in FY 1998 and $94 million in FY 1999 leaving general fund receipts to fill the State coffers in the neighborhood of $167.4 million and $187.5 million in FY 1998 and FY 1999, respectively.

¶30. About 56 million patrons visited the 29 state-licensed casinos[2] throughout FY 1999 with out-of-state residents accounting for 75 percent of that figure. Mississippi's state-regulated casinos contributed $695.8 million in FY 1999 to the local and state economic tax scheme through their payrolls employing an average of 32,785 casino employees during that year. It is estimated that $3.8 billion in direct/initial and subsequent investments can be attributed to the state-licensed casinos through June 1999 without considering more

recent land-based investments such as hotel construction, golf course developments, and recreational vehicle parks.

¶31. In light of this empirical data, Stoner can hardly be said to have complied with the dictates of Miss. Code Ann. § 23-17-1(3) (Supp. 1999). The dissent unsuccessfully attempts to avoid the obvious by parsing the finest hair in drawing a distinction between the wording in the statute and the eventual effect of the initiative, saying "Technically, Stoner is correct when she says the initiative does not *require* a reduction in any source of revenue," but a revenue loss may *result* as a consequence. Arguing that Stoner is correct in her evaluation of the economic forecast is akin to arguing that the failure to pay life insurance premiums does not require the insurer to cancel your policy, but only that cancellation may result.

¶32. While the process of having an initiative put before the electorate may be more complicated than need be, the statute requiring an accurate revenue impact statement is crystal clear. Allowing Stoner's submission to pass muster under the applicable statutory language would lure this Court into placing a blind wager on the State's economic vitality.

> **BANKS, P.J., AND McRAE, J., JOIN THIS OPINION.**

> **COBB, JUSTICE, DISSENTING:**

¶33. I respectfully dissent. In my opinion, the trial court exceeded its authority in this case.

¶34. Three times Elizabeth Stoner has utilized the rather convoluted initiative process[3] to provide the electorate of this State an opportunity to vote on whether for-profit gaming or gambling should be prohibited in Mississippi. Each time she accepted guidance from the appropriate state officials involved in the process and made adjustments in her documents accordingly. Although only proposed Initiative 20 is before this Court today, the record reflects Stoner's good faith efforts to follow the recommendations of the Attorney General and to comply with the laws governing the initiative process.

¶35. The Legislature obviously did not make the initiative process an easy one, and that is as it should be. However, neither did it make the process impossible to accomplish, and certainly it did not vest any authority in any court to determine at the outset, before the initiative is even put before the voters, that a proposed initiative measure, with only a ballot title and summary, is unconstitutional.

¶36. "Initiative", as defined in Black's Law Dictionary 788 (7th ed.1999), is "[a]n *electoral process* by which a percentage of voters can propose legislation and compel a vote on it by the legislature or by the full electorate." (emphasis added).[4] However, in general discussion, the majority opinion, and occasionally in the statutes themselves, the term "initiative" is often used to mean the actual proposed amendment itself, which is technically called the initiative "measure." *See* Miss. Code Ann. § 23-17-1(1) (Supp. 1999).

¶37. A careful reading of the entire Chapter 17 of Title 23 (Elections) of the Mississippi Code, reveals no mention of any person or entity having any control over the content of the proposed initiative measure itself. Section 23-17-5 does provide, however, that the Attorney General shall:

> review the proposal for matters of form and style, and ***such matters of substantive import as may be agreeable to the person filing the proposed measure***, and shall recommend such revision or alteration of the measure as may be deemed necessary and appropriate. ***The recommendations of the Attorney General shall be advisory only, and the person filing the proposed measure***

***may accept or reject them in whole or in part.***

(emphasis added). The record reflects that Stoner changed her proposed initiative measures each time, in response to the Attorney General's recommended changes.

¶38. Further, pursuant to Section 23-17-9, the Attorney General shall also formulate and transmit a summary of the measure to the Secretary of State, together with a concise statement giving a true and impartial statement of the purpose of the measure, which shall constitute the ballot title. The Secretary of State then shall forthwith notify the person proposing the measure of the exact language of the ballot title and shall publish the ballot title and summary in newspapers of general circulation throughout the State of Mississippi.

¶39. The statutory provision which led to the filing of the present case states that if any person is dissatisfied ***with the ballot title or summary*** formulated by the Attorney General, he or she may appeal to the Circuit Court of the First Judicial District of Hinds County by petition setting forth "his or her objections to the ballot title or summary and requesting amendment of the title or summary by the court," pursuant to Section 23-17-13, and

> the court shall accord first priority to examining the proposed measure, the title and summary prepared by the Attorney General and ***the objections to that title or summary.*** The court may hear arguments, and, within ten (10) days shall render its decision and file with the Secretary of State a certified copy of ***such ballot title or summary*** as it determines will meet the requirements of Section 23-17-9.

(emphasis added). No authority is given the circuit court to determine anything other than whether the ballot title or summary meets the requirements of Section 23-17-9.

¶40. Stoner is correct in her argument that a proposed initiative measure is not subject to substantive review by the court. The majority initially seems to agree, citing ***Power v. Ratliff***, 112 Miss. 88, 72 So. 864 (1916) for the proposition that "[i]t is true that proposed initiatives will not be reviewed by this or any other court for their wisdom and merit." However, without explanation, the majority then ignores the holding in ***Power,*** in which several citizens sought an injunction against the secretary of state to restrain him from acting upon petitions filed pursuant to an initiative . The trial court granted the injunction, but this Court reversed, stating "[i]t is well settled that courts cannot interfere with the Legislature in the enactment of a void statute or with a municipal corporation in the mere enactment of a void ordinance. . . ." [T]he qualified electors are now undertaking to act in pursuance of this authority (initiative and referendum), and in attempting to December 18, 2000have the laws in question referred to their vote they are at least attempting the performance of a legislative act, and the courts have no more right to interfere with this legislative act of the people than they have to prevent an abortive attempt of the Legislature to pass a law. . . . the courts have nothing to do with the making [of the laws], but must deal altogether with the finished product." ***Id.,*** 72 So. at 867.

¶41. In other states where, like Mississippi, judicial review of the merits and/or substance of an initiative is not prescribed by the constitution or statute, the highest state courts have consistently held that judicial review of the merits is a non-justiciable question. Alaska, Arizona, Colorado, Idaho, Oregon, and Washington all have held that pre-election review of the merits of an initiative to amend their constitutions is barred by the separation of powers doctrine. *See, e.g.,* ***Brooks v. Wright***, 971 P.2d 1025, 1027 (Alaska

1999) ("[g]eneral contentions that the provisions of an initiative are unconstitutional are justiciable only after the initiative has been enacted by the electorate"); ***Tilson v. Mofford***, 737 P.2d 1367, 1369 (Ariz. 1987) (en banc) ("Just as under the separation of powers doctrine the courts are powerless to predetermine the constitutionality of the substance of legislation, so also they are powerless to predetermine the validity of the substance of an initiated measure"); ***In re Title, Ballot Title, & Submission Clause***, 943 P.2d 897, 900 (Colo. 1997) (en banc) ("We do not address the merits of a proposed initiative, nor do we interpret its language or predict its application if adopted by the electorate") (citations omitted).

¶42. The majority's vision of "unbridled ballot box chaos" is unfounded. The initiative process has been structured in such a way as to provide many safeguards before a measure is placed on the ballot. The sponsor of an initiative measure not only must obtain signatures of voters equal in number to at least 12% of the votes cast for gubernatorial candidates in the last general election, but also must pay for the printing of petitions, pay a $500 administrative fee to the Secretary of State, and then must take the proposal to the Legislature to seek enactment. The Legislature may adopt, amend, reject or take no action at all with regard to the initiative measure, and then the initiative is placed on the ballot for the next statewide general election.

¶43. I respectfully disagree with the majority's conclusion that the Hinds County Circuit Court is the proper venue and has jurisdiction to review the facial constitutionality of proposed initiatives.

¶44. I also respectfully disagree with the majority's conclusion that Stoner's revenue impact statement is patently unreasonable.

¶45. The statutory and constitutional revenue impact statement requirements are general, not specific. At best, a citizen proposing an initiative measure can only speculate or estimate what the impact will be and which program will be affected. Further, the statute and constitution do ***not*** say "[i]f the initiative ***results*** in a reduction in any source of revenue..." but rather say "[i]f the initiative ***requires*** a reduction...." Technically, Stoner's proposed initiative requires only the prohibition of gambling, not a reduction in any source of revenue. That is not to say that a reduction of revenue may not occur.

¶46. Miss. Code Ann. § 23-17-1(3) requires that:

> (3) The sponsor of an initiative shall identify in the text of the initiative the amount and source of revenue required to implement the initiative. If the initiative requires a reduction in any source of government revenue, or a reallocation of funding from currently funded programs, the sponsor shall identify in the text of the initiative the program or programs whose funding must be reduced or eliminated to implement the initiative.

¶47. Stoner's revenue impact statement, which she changed to reflect recommendations made by the Attorney General, reads as follows:

> (4) Implementation of this initiative will require $1,000,000 in revenue. The source of revenue which will cover implementation cost of the initiative will be derived from the budget of the Mississippi Gaming Commission.

> (5) This initiative ***requires*** no reduction in any source of government revenue, nor a reallocation of funding from currently funded programs. While the Attorney General has opined that the initiative ***may*** result in a loss of government revenue, any indirect loss of revenue will be more than offset by the savings resulting from elimination of the severe negative social and economic effects of gambling. The

only program whose funding must be reduced or eliminated to implement this initiative would be the Mississippi Gaming Commission.

(emphasis in original).

¶48. While one might disagree with Stoner's position, the public debate of the cost/benefit analysis of gambling has provided support for her position. One comprehensive review of the impact of casino gambling in Mississippi presents the negative as well as positive aspects of the industry. Ronald J. Rychlak, *The Introduction of Casino Gambling: Public Policy and the Law*, 64 Miss. L.J. 291 (1995). Acknowledging that "it is quite difficult to evaluate the impact that the gaming industry has had on Mississippi," *Id.* at 293, the article addresses not only the negative economic impacts on local businesses (e.g. closing of local "mom and pop" establishments, labor shortages, and high prices of materials) but also social issues, stating: "There are at least five important non-economic impacts that the state must carefully consider when setting policy: the impact on people prone to compulsive behavior, the impact on children, the impact on poor people, the impact on crime and the impact on the environment. Failure to pay special attention to these matters may "generate social costs exceeding benefits." *Id.* at 333. (footnotes omitted).

¶49. Miss. Code Ann. § 23-17-31(2) requires that "[t]he chief legislative budget officer shall prepare a fiscal analysis of each initiative and each legislative alternative. A summary of each fiscal analysis shall appear on the ballot." Thus, the revenue impact statement required under Miss. Code Ann. Section 23-17-1(3) and Section 273 of the Mississippi Constitution, need only be a general statement creating an awareness of the possible impact. Contrary to the concerns of the majority, the revenue impact statement provided by a proponent of an initiative is not published on the ballot or elsewhere. Only the official fiscal analysis is published.

¶50. Since I would reverse and remand because the circuit court exceeded its authority, it is not necessary to address the remainder of the circuit court's order in detail. However, it was error to hold that Stoner was barred pursuant to the doctrine of res judicata and/or collateral estoppel. The court's finding that the instant proposed initiative measure No. 20 is "in all pertinent respects identical" to Stoner's prior initiative measures No. 12 and No. 13 is simply incorrect. Measure No. 20 clearly addressed the recommendations of the Attorney General and included revenue impact statements which were missing in the first two initiatives.

¶51. I would reverse and remand to the circuit court to address the only issue which is properly before that court: whether the ballot title and summary formulated by the Attorney General meet the requirements of Section 23-17-9. Upon that determination, Stoner should be allowed to continue the long journey and to jump the many hurdles which still lie ahead in her effort to get the initiative measure on the ballot.

**SMITH, J., JOINS THIS OPINION.**

1. Division of Tourism Development Research Unit, Mississippi Dep't of Economic & Community Development, "Fiscal Year 1999 Economic Impact for Tourism and Recreation in Mississippi" at 42-45 (Feb. 2000).

2. Tax revenue information and payroll statistics concerning the Silver Star Resort and Casino on the Choctaw Indian Reservation near Philadelphia are not included in this opinion as it is not regulated by the Mississippi Gaming Commission. Undeniably, it has had an economic impact of its own by virtue of the unique position it holds in the Choctaw community.

3. In 1992, the Legislature enacted Miss. Code Ann. §§ 23-17-1 et seq. (Supp. 1999), which established a multi-level, multi-step petition process permitting the voters of Mississippi to amend the Constitution by voter initiative. That same year, companion legislation was passed, and later ratified by the electorate, to amend Section 273 of the Mississippi Constitution to comport with the statutory scheme. Prior to these enactments, the citizens' power to initiate constitutional amendments had lain dormant since this Court in 1922 found a prior initiative and referendum amendment was "unconstitutional and void." ***Power v. Robertson***, 130 Miss. 188, 230-31, 93 So. 769, 775-77 (1922).

4. The initiative process in Mississippi, however, is limited to initiating proposed amendments to the Constitution of this State, and does not include initiating legislation. *See* Miss. Code Ann. § 23-17-1(2) (Supp. 1999).