STATE of Alaska, Loren Leman, Lieutenant Governor, and Gregg D. Renkes, Alaska Attorney General, Appellants,

v.

TRUST THE PEOPLE, the Initiative Committee Sponsoring 03SENV, consisting of Eric Croft, Harry T. Crawford, Jr., and David Guttenberg, Appellees.

No. S–11288.

Supreme Court of Alaska.

May 27, 2005.

Joanne M. Grace, Assistant Attorney General, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for Appellants.

Peter J. Aschenbrenner, Aschenbrenner Law Offices, Inc., Fairbanks, and Jeffrey M. Feldman, Feldman & Orlansky, Anchorage, for Appellees.

Peter J. Maassen, Ingaldson, Maassen & Fitzgerald, Anchorage, for Amicus Curiae Alaska Public Interest Research Group.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

1. The Order provided:

> Trust the People, an initiative committee, submitted an initiative that proposed to determine the manner in which vacancies in Alaska's two United States Senate seats would be filled; after some delay in the certification process, Trust the People filed suit against Lieutenant Governor Loren Leman. The Lieutenant Governor eventually denied certification of the initiative, determining that the Seventeenth Amendment of the United States Constitution prohibited enactment of the proposed law by initiative. Following oral argument on the issue, Superior Court Judge Mark Rindner ruled that the constitutionality of the initiative should not be considered unless and until the voters enact the initiative into law; accordingly, he held that the Lieutenant Governor erred by denying certification of initiative and ordered him to certify the initiative. Pursuant to the superior court's order, the initiative was certified; it was subsequently placed on the ballot for the November 2004 statewide general election.
>
> On June 5, 2004 House Bill (H.B.) 414, "An Act relating to filling a vacancy in the office of United States senator, and to the definition of 'political party'; and providing for an effective date" was enacted into law. On June 15, 2004 the Lieutenant Governor removed the initiative from the ballot and the state moved to dismiss this appeal as moot on the grounds that H.B. 414 and the initiative were substantially the same, and that the initiative was therefore void under article XI, section 4 of the Alaska Constitution. Trust the People filed a separate case in superior court seeking a declaratory judgment that the proposed initiative must be placed on the November ballot. On July 8, 2004 we issued an order in which we informed the parties that we would consider the issue of substantial sameness when we considered the merits appeal involving the Seventeenth Amendment from the first superior court action. Oral argument was held before this court on July 21, 2004.
>
> **IT IS ORDERED:**

*OPINION*

CARPENETI, Justice.

# I. INTRODUCTION

Because of the need for resolution of the issues raised in this case before the election, we issued our Order on August 20, 2004, with an opinion to follow. This is that opinion.[1]

A citizens' group obtained sufficient signatures to place on the November 2004 ballot an initiative restricting the governor's power to temporarily appoint a United States senator. This case concerned whether the initiative should go before the voters.

> 1. The law enacted to supplant the initiative (HB 414) is not substantially the same as the initiative because (1) it provides that the governor will fill a senate vacancy by appointment, whereas the initiative provides that all vacancies will be filled by popular election, and (2) eliminating gubernatorial appointments from the process of filling senate vacancies is a primary objective of the initiative. Therefore, the initiative is not void, and the state's motion to dismiss this appeal as moot is DENIED.
>
> 2. Judge Rindner did not err in declining to consider whether the initiative violates the Seventeenth Amendment unless and until it is approved by the voters and in ruling that the lieutenant governor wrongfully denied certification of the initiative. The general rule is that a court should not determine the constitutionality of an initiative unless and until it is enacted. There are two exceptions to this. First, where the initiative is challenged on the basis that it does not comply with the state constitutional and statutory provisions regulating initiatives, courts are empowered to conduct pre-election review. Second, courts are also empowered to conduct pre-election review of initiatives where the initiative is clearly unconstitutional or clearly unlawful. Neither exception applies to this case. The first exception does not apply because the present challenge does not involve state constitutional and statutory provisions regulating initiatives. The second exception does not apply because the initiative is .not clearly unconstitutional: whether the Seventeenth Amendment permits or precludes lawmaking by initiative with respect to filling senate vacancies presents an open and fairly debatable constitutional question. The decision of the superior court, deferring review of the initiative and directing the lieutenant governor to certify the initiative, is AFFIRMED.
>
> 3. The initiative entitled "An Act Relating to Filling a Vacancy in the Office of United States Senator" (03–SENV) shall be placed on the ballot.
>
> 4. An opinion will follow.

The Alaska Constitution provides that if the legislature enacts legislation that is "substantially the same" as a proposed initiative, the initiative is void. Because the legislature enacted legislation that addresses the same topic, the lieutenant governor removed the initiative from the ballot. This case first required us to determine whether the legislation is "substantially the same" as the initiative so as to render it void under the Alaska Constitution. We decided this question in the negative. Because we concluded that the principal purpose of the initiative is to completely remove from the governor all power to make temporary appointments to the office of United States senator, while the effect of the legislation is to preserve in all cases the governor's power to make temporary appointments to that office, we held that the legislation is not "substantially the same" as the initiative.

The Seventeenth Amendment to the United States Constitution provides that "the legislature" of any state may empower the governor to make a temporary appointment of a United States senator when a vacancy occurs in that office. The state argues that this power is reserved to the Alaska State Legislature and may not be exercised by the people through the initiative. The initiative sponsors respond that this dispute is not subject to resolution before the election; they claim that it will only be ripe for decision if the initiative passes. Thus, the case required that we determine whether preelection review of the initiative is appropriate under our law. We decided this question also in the negative. We concluded that preelection review may extend only to subject-matter restrictions that arise from Alaska law and that specifically address the initiative process or to proposals that are clearly unlawful under controlling authority. Because the proposed initiative meets neither of these tests, we held that it should go before the voters and that the state's Seventeenth Amendment challenge was premature.

Accordingly, we directed the lieutenant governor to place the initiative on the November ballot.

## II. FACTS AND PROCEEDINGS

In Alaska the people's right to enact legislation by initiative is guaranteed by article XI of the Alaska Constitution, which states: "The people may propose and enact laws by the initiative, and approve or reject acts of the legislature by the referendum." [2] Once an application for a proposed initiative has been signed by one hundred qualified voters, it is filed with the lieutenant governor, who must certify the initiative if he finds it in the proper form.[3]

On September 4, 2003 an initiative committee named Trust the People sought to exercise the power granted by article XI. The committee submitted an initiative application for a proposed bill entitled "An Act Relating to Filling a Vacancy in the Office of United States Senator" (03–SENV, also referred to as "the initiative"). The proposed initiative was intended to repeal former AS 15.40.010, which gave the governor the power to fill a vacancy in the office of United States senator by appointment. Under the prior law, if thirty months or less remained in a vacating senator's term, the governor's appointee would serve as senator for the remainder of the term. When the initiative was submitted, AS 15.40.010 provided:

> When a vacancy occurs in the office of United States senator, the governor, at least five days after the date of the vacancy but within 30 days after the date of the vacancy, shall
>
> (1) appoint a qualified person who, if the predecessor in office was nominated by a political party, has been, for the six months before the date of the vacancy, and is, on the date of appointment, a member of the same political party as that which nominated the predecessor in office to fill the

2. ALASKA CONST., art. XI, § 1. There are certain subject matter limitations on the people's power to enact initiatives. Initiatives "shall not be used to dedicate revenue, make or repeal appropriations, create courts, define the jurisdiction of courts or prescribe their rules, or enact local or special legislation." ALASKA CONST.,

art. XI, § 7. The proposed initiative now before the court does not implicate any of these limitations.

3. ALASKA CONST., art. XI, § 2.

vacancy temporarily until the vacancy is filled permanently by election; and

(2) by proclamation and subject to this chapter, call a special primary election and a special election to fill the vacancy for the remainder of the term of the predecessor in office if the predecessor's term would expire more than 30 calendar months after the date of the vacancy.[4]

Under the proposed initiative, all vacancies in the office of United States senator must be

4. *See* Ch. 4, § 1, SLA 2002. This statute was amended on June 5, 2004 by H.B. 414. *See* Ch. 50, SLA 2004.

5. *See* AS 15.40.140–.220.

6. *Section 1.* AS 15.40.140 is amended to read:
*Sec. 15.40.140. Condition and time of calling special election.* When a vacancy occurs in the office of United States senator or United States representative, the governor shall, by proclamation, call a special election to be held on a date not less than 60, nor more than 90, days after the date the vacancy occurs. However, if the vacancy occurs on a date that is less than 60 days before or is on or after the date of the primary election in the general election year during which a candidate to fill the office is regularly elected, the governor may not call a special election.
*Section 2.* AS 15.40 is amended by a adding a new section to read:
*Sec. 15.40.165. Term of elected senator.* At the special election, a United States senator shall be elected to fill the remainder of the unexpired term. The person elected shall take office on the date the United States Senate meets, convenes, or reconvenes following the certification of the results of the special election by the director.
*Section 3.* AS 15.40.200 is amended to read:
*Sec. 15.40 200. Requirements of party petition.* Petitions for the nomination of candidates of political parties shall state in substance that the party desires and intends to support the named candidate for the office of United States senator or United States representative, as appropriate, at the special election and requests that the name of the candidate nominated be placed on the ballot.
*Section 4.* AS 15.40.220 is amended to read:
*Sec. 15.40.220. General provisions for conduct of special election.* Unless specifically provided otherwise, all provisions regarding the conduct of the general election shall govern the conduct of the special election of the United States senator or United States representative, including provisions concerning voter qualifications; provisions regarding the duties, powers, rights, and obligations of the director, of other election officials, and municipalities;

filled by the voters in a special election and the governor would have no power of appointment. Under the proposed initiative there could be no incumbency advantage because no temporary appointment would be permitted. The procedural aspects of the special election (timing, term limits, primaries, etc.) would mirror the current method by which vacancies in the office of United States representative are filled by special election.[5] We set out the proposed initiative in its entirety in the margin.[6]

provision for notification of the election; provision for payment of election expenses; provisions regarding employees being allowed time from work to vote; provisions for the counting, reviewing, and certification of returns; provisions for the determination of the votes and of recounts, contests, and appeal; and provision for absentee voting.
*Section 5.* AS 15.40.310 is amended to read:
*Sec. 15.40.310. General provisions for conduct of special election.* Unless specifically provided otherwise, all provisions regarding the conduct of the general election shall govern the conduct of the special election of the governor and lieutenant governor, including provisions concerning voter qualifications; provisions regarding the duties, powers, rights, and obligations of the director, of other election officials, and of municipalities; provision for notification of the election; provision for payment of election expenses; provisions regarding employees being allowed time from work to vote; provisions for the counting, reviewing, and certification of returns; provisions for the determination of the votes and of recounts, contests, and appeal; and provision for absentee voting.
*Section 6.* AS 15.40.470 is amended to read:
*Sec. 15.40.470. General provision for conduct of special election.* Unless specifically provided otherwise, all provisions regarding the conduct of the general election shall govern the conduct of the special election of state senators, including the provisions concerning voter qualifications; provisions regarding the duties, powers, rights, and obligations of the director, of other election officials, and of municipalities; provision for notification of the election; provision for payment of election expenses; provisions regarding employees being allowed time from work to vote; provisions for the counting, reviewing, and certification of returns; provisions for the determination of the votes and of recounts, contests, and appeal; and provision for absentee voting.
*Section 7.* AS 15.40.010, 15.40.050, 15.40.060, 15.40.070, 15.40.075, 15.40.130, and [ ] 15.40.135 are repealed.
*Section 8. Effective Date.* This Act takes effect January 1, 2005.

After the initiative was submitted to Lieutenant Governor Loren Leman, it was referred to the Department of Law for pre-certification review. When a month passed and the initiative had not been certified, Trust the People filed a complaint against Lieutenant Governor Leman and Attorney General Gregg Renkes (*"Trust the People I"*). Trust the People alleged that Lieutenant Governor Leman and Attorney General Renkes were unlawfully delaying certification in violation of Alaska statutory and constitutional law. Trust the People sought a declaratory judgment that the lieutenant governor was required to immediately certify the initiative and prepare petitions and booklets for circulation. A hearing concerning the delay was held on October 10, 2003 before Superior Court Judge Mark Rindner. At the hearing the parties agreed that by October 27, 2003 the lieutenant governor would either certify the initiative and provide Trust the People with petition booklets as required by law or provide Trust the People with a written denial of certification. A written order concerning the parties' agreement was entered on October 13, 2003.

On October 20, 2003 the Department of Law issued an opinion stating that the initiative "is not a proper exercise of the law making power reserved to the people under Article XII, Section 11 of the Alaska Constitution."[7] The Department of Law determined that, under the Seventeenth Amendment to the United States Constitution, the people do not have the power to determine by initiative the method by which vacancies in the office of U.S. senator will be filled. The Seventeenth Amendment states in full:

> The Senate of the United States shall be composed of two Senators from each State, elected by the people thereof, for six years; and each Senator shall have one vote. The electors in each State shall have the qualifications requisite for electors of the most numerous branch of the State legislatures.

When vacancies happen in the representation of any state in the Senate, the executive authority of such State shall issue writs of election to fill such vacancies: *Provided.* That the legislature of any State may empower the executive thereof to make temporary appointments until the people fill the vacancies by election as the legislature may direct.

This amendment shall not be so construed as to affect the election or term of any Senator chosen before it becomes valid as part of the Constitution.

Concluding that the plain language of the Seventeenth Amendment vests the power to determine how to fill U.S. Senate vacancies exclusively in each state's formal representative body, the department recommended that the lieutenant governor not certify the initiative because it proposed a law that may not be enacted via the initiative process. Lieutenant Governor Leman denied certification of the initiative on October 21, 2003.

On October 30, 2003 Judge Rindner conducted a hearing regarding the denial of certification. Trust the People argued that the lieutenant governor's power to deny certification of initiatives was limited to "precise state constitutional ... guidelines" (presumably those set out in article XI, section 7 of the Alaska Constitution) and had therefore been improperly exercised in this case. Trust the People also argued that any question regarding the constitutionality of the initiative could be addressed through review by the courts only if and when the voters of Alaska passed the initiative. The state argued that Lieutenant Governor Leman had the power to deny certification if the initiative concerned a subject that was outside the people's initiative power, and that denial was proper in this case because under federal constitutional law, the method of filling U.S. Senate vacancies cannot be determined by initiative.

**7.** Article XII, section 11 of the Alaska Constitution provides:
> As used in this constitution, the terms "by law" and "by the legislature," or variations of these terms, are used interchangeably when related to the law-making powers. *Unless clearly in-*

*applicable, the law-making powers assigned to the legislature may be exercised by the people though the initiative, subject to the limitations of Article XI.*
(Emphasis added.)

Relying on our decision in *Kodiak Island Borough v. Mahoney*,[8] Judge Rindner ruled that the constitutionality of the proposed initiative should not be considered unless and until the Alaska voters enact the initiative into law. Accordingly, Judge Rindner held that Lieutenant Governor Leman erred by denying certification and ordered him to certify the initiative and provide petition books to Trust the People.[9] Judge Rindner emphasized that he was not reaching the merits of the state's Seventeenth Amendment argument. The state appealed but did not seek a stay of the superior court's order. Trust the People circulated the petition and obtained almost 50,000 signatures. On October 30, 2003 Lieutenant Governor Leman certified the petition for inclusion on the ballot for the November 2004 statewide general election.

Briefing for the appeal of the superior court's decision was completed by early May. On June 5, 2004 House Bill (H.B.) 414, "An Act relating to filling a vacancy in the office of United States senator, and to the definition of 'political party'; and providing for an effective date"[10] was enacted into law without Governor Murkowski's signature.[11] House Bill 414 provides in pertinent part:

**Section 1.** The uncodified law of the State of Alaska is amended by adding a new section to read:

LEGISLATIVE INTENT. It is the desire of this legislature that the provisions of secs. 2–8 and 10 of this Act, which are substantially similar to those proposed in an initiative petition, not be repealed for at least two years after the Act's effective date.

**Section 2.** AS 15.40.140 is amended to read:

**Sec. 15.40.140 Condition and time of calling of special election.** When a vacancy occurs in the office of *United States senator* or United States representative, the governor shall, by proclamation, call a special election to be held on a date not less than 60, nor more than 90, days after the date the vacancy occurs. However, if the vacancy occurs on a date that is less than 60 days before or is on or after the date of the primary election in *the* general election year *during which a candidate to fill the office is regularly elected,* the governor may not call a special election. **Section 3.** AS 15.40 is amended by adding a new section to read:

**Sec. 15.40.145. Temporary Appointment of United States Senator.** When a vacancy occurs in the office of United States senator, the governor may, at least five days after the date of the vacancy but within 30 days after the date of the vacancy, appoint a qualified individual to fill the vacancy temporarily until the results of the special election called to fill the vacancy are certified. If a special election is not called for the reasons set out in AS 15.40.140, the individual shall fill the vacancy temporarily until the results of the next general election are certified.

Following passage of H.B. 414, this court on June 9 asked the parties to address whether the case was moot, or to file a motion to dismiss. On June 16 Lieutenant Governor Leman removed the initiative from the ballot. The lieutenant governor, concurring with an opinion from Attorney General Renkes, determined that the proposed initiative was void because it was "substantially similar" to H.B. 414. The state then sought to dismiss its appeal to this court, arguing that passage of H.B. 414 had rendered the appeal moot.

---

8. 71 P.3d 896 (Alaska 2003). In *Mahoney* we held that a municipal clerk,

> in determining whether an initiative "would be enforceable as a matter of law," should only reject a petition that violates any of the liberally construed statutory or constitutional restrictions on initiatives or that proposes a substantive ordinance where controlling authority establishes unconstitutionality.

*Id.* at 900. *See infra* discussion at Part IV.B.

9. *Trust the People v. State of Alaska,* No. 3AN–03–12217 Ci. (Alaska Super., November 3, 2003).

10. H.B. 414, 23rd Legis., 2d Sess. (2004).

11. *See* bill history for H.B. 414, available at http://www.legis .state.ak.us/basis (last visited July 27, 2004). Under the Alaska Constitution, when the legislature is not in session, the governor has twenty days to sign or veto a bill, or it will become law without his signature. ALASKA CONST. art. II, § 17. Because the governor neither signed nor vetoed H.B. 414, it became law without his signature.

Trust the People opposed dismissal, claiming that the proposed initiative and H.B. 414 were not substantially the same. Trust the People filed a new action in the superior court, seeking a declaratory judgment that the proposed initiative must be placed on the ballot for the statewide general election in November 2004 and requesting injunctive relief to prohibit the state from interfering with a popular vote on the initiative (*"Trust the People II"*).[12] Trust the People argued that Lieutenant Governor Leman's removal of the initiative from the ballot violated state statutory and constitutional law. The state sought to stay the proceedings in *Trust the People II* pending our resolution of its appeal in *Trust the People I*. Superior Court Judge Morgan Christen denied the state's motion and ordered expedited consideration of the case. The state then filed a petition for review, seeking to reverse the superior court's denial of a stay.

On July 8 we issued an order granting the state's petition for a stay in *Trust the People II*. We informed both parties that we would consider the issue of mootness on an expedited basis when we considered the merits of *Trust the People I*. Oral argument was held July 21, 2004. On August 20, 2004 we issued the order set out in footnote 1.

In addition to the briefs filed by the parties to this case, the Alaska Public Interest Research Group (AKPIRG) has filed a brief as *amicus curiae*.

### III. STANDARD OF REVIEW

 This appeal raises questions of both state and federal constitutional law, which we review using our independent judgment.[13] We liberally construe state constitutional provisions that apply to the initiative process, particularly provisions concerning subject matter limitations.[14] Liberal construction of federal constitutional provisions, however, is not appropriate.[15]

### IV. DISCUSSION

Resolution of this case requires consideration of two issues: (1) Is the initiative void under article XI, section 4 of the Alaska Constitution, which states that an initiative is void if the legislature passes "substantially the same" measure? (2) Should the state's Seventeenth Amendment challenge to the proposed initiative be resolved before the initiative is put on the ballot?

### A. Is the Proposed Initiative Void Under Article XI, Section 4 of the Alaska Constitution Because It Is "Substantially the Same" as H.B. 414?

 Article XI, section 4 of the Alaska Constitution provides:

An initiative petition may be filed at any time. The lieutenant governor shall prepare a ballot title and proposition summarizing the proposed law, and shall place them on the ballot for the first statewide election held more than one hundred twenty days after adjournment of the legislative session following the filing. *If, before the election, substantially the same measure has been enacted, the petition is void.*[16]

(Emphasis added.)

The proposed initiative states in relevant part that:

---

**12.** *Trust the People v. Leman*, No. 3AN-04-08185 Ci.

**13.** *See State, Dep't of Revenue v. Andrade*, 23 P.3d 58, 65 (Alaska 2001) (questions of law reviewed *de novo* ).

**14.** *Brooks v. Wright*, 971 P.2d 1025, 1027 (Alaska 1999).

**15.** *See Bailey v. Alabama*, 219 U.S. 219, 239, 31 S.Ct. 145, 55 L.Ed. 191 (1911) ("[A state's] power to create presumptions is not a means of escape from [federal] constitutional restrictions.").

**16.** The procedure for finding an initiative void on grounds of substantial sameness is codified in AS 15.45.210:

If the lieutenant governor, with the formal concurrence of the attorney general, determines that an act of the legislature that is substantially the same as the proposed law was enacted after the petition had been filed, and before the date of the election, the petition is void and the lieutenant governor shall so notify the committee.

The lieutenant governor's decision to remove an initiative from the ballot on this ground is subject to judicial review. AS 15.45.240.

When a vacancy occurs in the office of United States senator or United States representative, the governor shall, by proclamation, call a special election to be held on a date not less than 60, nor more than 90, days after the date the vacancy occurs. However, if the vacancy occurs on a date that is less than 60 days before or is on or after the date of the primary election in the general election year during which a candidate to fill the office is regularly elected, the governor may not call a special election.

The proposed initiative would repeal the statutory provisions in AS 15.40.010 empowering the governor to make a temporary appointment to fill a senate vacancy. According to the impartial summary of the initiative prepared for the petition booklets by the lieutenant governor, the initiative "would repeal state laws by which the governor makes a temporary appointment of a Senator who serves until an election can be held."

Following the submission of the initiative to the lieutenant governor for placement on the ballot, the Alaska legislature passed H.B. 414. In contrast to the proposed initiative, H.B. 414 retains the governor's temporary appointment power in every case in which a senate vacancy might arise. House Bill 414 states in relevant part:

When a vacancy occurs in the office of United States senator, the governor may, at least five days after the date of the vacancy but within 30 days after the date of the vacancy, appoint a qualified individual to fill the vacancy temporarily until the results of the special election called to fill the vacancy are certified. If a special election is not called for the reasons set out in AS 15.40.140, the individual shall fill the vacancy temporarily until the results of the next general election are certified.

Notwithstanding this difference, the lieutenant governor determined that the initia-

tive and H.B. 414 are substantially the same. Accordingly, he deemed the initiative void and removed it from the ballot. The parties sharply dispute whether the initiative and the bill are in fact "substantially the same."

The definition of "substantially the same" is not apparent from the text of the Alaska Constitution. And in *Warren v. Boucher*,[17] we noted that there is "nothing in the legislative history of the article, or in the vigorous floor debates thereon, which points to an agreed upon meaning or a consciously adopted definition of what this critical language should mean" or that offers any "helpful discussion of what was the intended scope of the words."[18] We also noted that "the words 'substantial' or 'substantially' are relative, inexact terms," whose meaning is "quite elusive."[19] We therefore examined the question "against the total structure" of Alaska's constitutional system of direct legislation.[20]

■ We noted that the original proposal of the Constitutional Convention Committee called for "[l]aws proposed by initiative [to] be submitted to the voters ... unless the legislature enacts *the measure* initiated ...."[21] The insertion of "substantially the same measure" in place of "the measure" demonstrated that the framers wished to allow some flexibility to the legislature.[22] At the same time, we noted the framers' conviction that popular enactment of legislation should not be frustrated by legislative veto.[23] We ultimately decided that a legislative act is "substantially the same" as the initiative it seeks to supersede if "in the main the legislative act achieves the same general purpose as the initiative [and] accomplishes that purpose by means or systems which are fairly comparable."[24] We also noted that "[t]he broader the reach of the subject matter, the more latitude must be allowed the legislature to vary from the particular features of the ini-

17. 543 P.2d 731 (Alaska 1975).

18. *Id.* at 735.

19. *Id.* at 736.

20. *Id.*

21. *Id.* at 735 (quoting Constitution Convention Committee's Proposal No. 3) (emphasis added).

22. *Id.* at 736.

23. *Id.* at 737.

24. *Id.* at 736.

tiative." [25] Thus, *Warren* developed a three-part test to determine whether a proposed initiative and legislation are substantially the same: A court must first determine the scope of the subject matter, and afford the legislature greater or lesser latitude depending on whether the subject matter is broad or narrow; next, it must consider whether the general purpose of the legislation is the same as the general purpose of the initiative; and finally it must consider whether the means by which that purpose is effectuated are the same in both the legislation and the initiative.

Turning to the first part of the test, we note that the subject matter of the legislation and the initiative before us—filling senate vacancies—is narrow. It is far narrower than the subject matter of campaign finance reform that we considered in *Warren.* The legislation in *Warren* was broad and complicated, touching upon a great range of topics, including campaign spending limits, reporting of contributions and expenses, restrictions on anonymous contributions, penalties for non-compliance, the creation of an elections oversight committee to monitor elections, and several other topics. [26] In the present case, the legislation is simple and straightforward, essentially dealing with only one substantive topic: filling of a U.S. Senate vacancy. We agree with Trust the People's assessment that "[t]he simpler and more focused a law is, the fewer details that can be adjusted without effecting a fundamental change in the measure's purpose and effect." As such, we begin our analysis with the view that the legislature should be accorded less latitude in its attempts to "vary from the particular features of the initiative." [27]

Turning to the next part of the test, we consider the general purpose of both the initiative and H.B. 414. The controversy before us differs fundamentally from the issue we addressed in *Warren.* In that case, both the initiative and the proposed legislation imposed greater controls over election contributions and expenditures; and despite some differences, it was clear that they both addressed the subject matter in similar ways. [28] (Indeed, the dispute in *Warren* turned almost exclusively on the third part of the test, the means by which the competing versions of the law sought to vindicate their clearly common purpose of campaign finance reform.) We stated that the legislature's changes to the initiative did not "vitiate[ ] the aims of the initiative, but ma[de] those aims more feasible of achievement." [29] The legislature had made numerous changes to the initiative that implicated the scope of the law, its enforcement mechanisms, and other structural issues concerning the regulation of campaign finance reform. But because these changes were seen as promoting the shared goals of both the bill and the initiative, we were willing to accept the legislature's bill as "substantially the same" as its initiative counterpart, even though there were in fact differences in the texts. [30] But we cannot find that the competing versions of the legislation before us in this case share a common purpose. Indeed, as we explain more fully below, we believe the initiative and H.B. 414 have opposite objectives.

In order to determine the respective purposes of H.B. 414 and the initiative, we look to their texts to determine intent. [31] This, in turn, requires us to review the circumstances surrounding the origins of the initiative.

As amended in 1998, AS 15.40.010 provided in relevant part:

> When a vacancy occurs in the office of United States senator, the governor, within 30 days after the date of the vacancy, shall (1) appoint a qualified person ... to fill the vacancy temporarily until the va-

25. *Id.*

26. *Id.* at 737–38.

27. *Id.* at 736.

28. *Id.* at 737–39.

29. *Id.* at 739.

30. *Id.* at 739–40. As the dissent in *Warren* pointed out, "of the 19 separate sections of the initiative, only six are the same as the statute," and "[s]even sections have been eliminated entirely by the statute." *Id.* at 741 (Erwin, J., dissenting).

31. *See Falcon v. Alaska Pub. Offices Comm'n,* 570 P.2d 469, 472 (Alaska 1977).

cancy is filled permanently by election; and (2) ... call a special primary election and a special election to fill the vacancy for the remainder of the term of the predecessor in office if the predecessor's term would expire more than 30 calendar months after the date of the vacancy.[32]

In 2002 the legislature amended the statute to restrict the governor from filling a vacancy until at least five days had passed from the date of the vacancy.[33] It was against this background that Trust the People formed for the purpose of changing the law by initiative. What was the intent of that initiative?

We have previously held that in determining the meaning that voters might attach to a ballot initiative, we will look to published arguments made in connection with the initiative.[34] At the time of our August 20, 2004 order,[35] there was very little published material available because the voters' handbook has not yet been published. However, the lieutenant governor's neutral statement of the initiative's purpose, prepared pursuant to state law[36] for the petition booklets, was available for our review. The lieutenant governor, in his neutral statement of the purpose of the proposed initiative, wrote that the initiative "would repeal state laws by which the governor makes a temporary appointment of a Senator who serves until an election can be held." Trust the People insists that H.B. 414 does not accomplish this purpose, but instead achieves precisely the opposite result.

The critical difference between the proposed initiative and the bill is that while the proposed initiative precludes gubernatorial appointment of a United States senator in *each and every case of vacancy,* H.B. 414 permits the governor to make a temporary appointment pending an election to fill the vacancy in each and every case. This means that, while the proposed initiative provides that in every instance Alaska's United States Senate seats will be filled only by Alaskan voters, H.B. 414 would allow an unelected executive appointee to · fill the seat for an interim period that could last as long as five months.[37]

The state argues that the initiative and the bill are "substantially the same" because they "accomplish the same general goal." That is, "under both the act and the initiative, a special election largely replaces the appointment process, unless the relevant general election will occur soon after the vacancy." But the state's argument does not take into consideration the two critical differences noted above between the texts of H.B. 414 and the proposed initiative: (1) H.B. 414 retains the executive appointment power in every case while the proposed initiative repeals that power entirely, which means that (2) H.B. 414 allows appointees to fill U.S. Senate seats while the initiative seeks to ensure that an unelected appointee will never represent Alaska in the U.S. Senate. We conclude that these differences are so important that it cannot be said that the proposed initiative and H.B. 414 are "substantially the same."

**32.** Ch. 30, § 1, SLA 1998.

**33.** Trust the People argues that the proposed initiative arose out of voter frustration with this change in the law. According to Trust the People, the essential aims of the initiative are "to remove the appointment power from the Governor, in direct response to Governor Murkowski's appointment of his daughter to fill his own Senate seat," and to "eliminate totally the incumbency advantage for appointed Senators never elected by the voters." The state "does not agree with all aspects" of Trust the People's factual claims, which it argues are based on unsubstantiated opinions. Our resolution of this case does not require us to determine whether there is merit to the assertions of Trust the People.

**34.** *Falcon,* 570 P.2d at 472 n. 6.

**35.** *See supra* note 1.

**36.** *See* AS 15.45.180(a).

**37.** House Bill 414 provides that the governor need not call a special election for U.S. senator where a vacancy occurs less than sixty days prior to the primary election in a general election year. Primary elections are generally held in the last week of August, and general elections in early November, with the results certified in late November or early December, at which point the winning candidate is sworn in as senator. Therefore, were a senatorial vacancy to occur in late June of a general election year, the governor's appointee would serve for roughly five months, or until the end of November. *See* the State of Alaska Division of Elections website, at http://www.gov. state.ak.us/ltgov /elections/homepage .html# results.

The state advances another argument to support its conclusion that H.B. 414 is substantially the same as the initiative. It notes that, pursuant to article XI, section 6 of the Alaska Constitution, the legislature may amend an initiative's terms at any time.[38] The state asserts that had the legislature not passed H.B. 414 to replace the initiative, it could just as easily have made the same changes to the law by amending the initiative once it was enacted. In *Warren*, we noted that the legislature's amendatory power is broad and, in *dicta*, we suggested that the legislature's power to supplant an initiative by enacting new legislation might be identical to its power to amend.[39] But the power to avoid an initiative by enacting legislation should not be equated with the power to amend an initiative enacted by the voters. While the *dicta* in *Warren v. Boucher* might be read to equate the two powers, they are not equal. This is because the Alaska Constitution contains no explicit limitation on the legislature's power to amend an initiative enacted by the voters,[40] but it does contain such a limitation on the legislature's power to avoid a proposed initiative: Legislation designed to avoid a vote on a proposed initiative must be "substantially the same" as the initiative.[41] Finally debate surrounding the adoption of article XI, section 4 reflects the framers' concern that the legislature be given only "the power to amend and not the power to destroy."[42] Thus, even amendments to popularly-initiated legislation must still "effectuate[ ] the intent of the electorate,"[43] and an amendment that "so vitiates an act passed by initiative as to constitute its repeal" is not acceptable.[44]

The essential inquiry, then, is whether any difference between H.B. 414 and the initiative "so vitiates" the initiative's uncontradicted general purpose as to render H.B. 414 not "substantially the same." Trust the People asserts that, by "continu[ing] the governor's appointment power and merely expand[ing] the period during which a special election is required," H.B. 414 "preserves" and "codifies" both the governor's appointment power and the incumbency advantage given to his appointees when they later stand for election. According to Trust the People, the initiative and the bill thus "materially differ." The state does not deny that this difference exists, but seeks to downplay or justify its effects, insisting that "[t]he act and the initiative do accomplish the same general goal," and that the short-term nature of the governor's appointment power under H.B. 414 "is not significant in light of the more general goals of the initiative and the act."

The state also argues that the legislature's modifications to the proposed initiative were necessary, because the initiative, as drafted, is ill-conceived legislation that could seriously cripple or frustrate the sound workings of government. According to the state, even a temporary vacancy in one of Alaska's United States Senate seats (which, under the initiative's framework could last as long as five months) could damage Alaska's "interests in the national government" and "make a difference in the passage of legislation important to Alaska." The state further argues that "[f]illing senate vacancies quickly also could be a matter of national importance," because "a terrorist attack on the Capitol could wipe out the United States Senate," and "[t]he ability of one branch of the federal govern-

---

**38.** The Constitutional Convention Committee's original proposal also stated that "[n]o law passed by initiative may be ... amended or repealed by the legislature for a period of three years," but this too was changed to the present constitutional language that an initiated law "may not be repealed by the legislature within two years of its effective date [but] may be amended at any time ...." Constitutional Convention Committee Proposal No. 3, Section 4 (Dec. 9, 1955).

**39.** *Warren v. Boucher*, 543 P.2d 731, 737 (Alaska 1975).

**40.** *See* ALASKA CONST., art. XI, § 6.

**41.** ALASKA CONST., art. XI, § 4.

**42.** *Warren*, 543 P.2d at 740 (Erwin, J., dissenting).

**43.** *Warren v. Thomas*, 568 P.2d 400, 403 (Alaska 1977) ("considerable language changes" in legislature's amendments of popularly-initiated law only served to "clarify and render the law more precise," and thus did not repeal it).

**44.** *Warren v. Boucher*, 543 P.2d at 737.

ment to function might depend on the states' ability to fill vacant seats quickly." While the state raises serious policy arguments in favor of H.B. 414, they relate to the wisdom of the legislation—and thus are more properly directed to the voters considering the proposed initiative—and not to the question whether the proposed initiative and H.B. 414 are substantially the same. As has been noted, the relevant judicial inquiry "is not whether the provisions are wise, but whether the legislative act is substantially the same as the initiative."[45]

The state also contends that an appointee running for a vacant seat in a general or special election may not necessarily derive any benefits from his or her status as an incumbent, thereby minimizing the differences between H.B. 414 and the proposed initiative. The state asserts that "[a] temporary appointee who is thousands of miles from Alaska and is trying to learn how to be a senator right before the election might be at a disadvantage as against a candidate present in Alaska, garnering support and raising money." "Indeed," the state says, "someone wishing to permanently fill the seat might well decline to take a temporary appointment." But had the legislature truly sought to assure that Alaska maintained competent representation in Washington while eliminating any incumbency advantage for a temporary appointee, it could have tailored H.B. 414 to forbid a governor's appointee from running for election after appointment. In fact, the legislative history indicates that such a provision was proposed and rejected.[46] This casts considerable doubt on the state's claim that H.B. 414 is substantially the same as the proposed initiative.

We conclude that the intent of the proposed initiative is to strip the governor of appointment power, to ensure that occupants of Alaska's seats in the United States Senate are chosen by the voters, and to eliminate all

of the perceived advantages that an incumbent appointee might receive in a special or general election to fill the vacancy. House Bill 414 preserves the power of gubernatorial appointment in every case of a vacancy, it allows vacancies in the United States Senate to be filled first by executive appointment rather than only by the voters, and it preserves potential incumbency advantages that might be conferred on the executive's appointee. Because the initiative and H.B. 414 seek to accomplish different objectives, they do not share a common purpose and they are not "substantially the same." Accordingly, we hold that the initiative has not been voided by enactment of H.B. 414.

## B. Should the Constitutionality of the Proposed Initiative Be Reviewed Before the November 2004 Election?

■ The state argues that, even if the petition were not voided on grounds of "substantial sameness," we should hold that it cannot be placed on the November ballot because the Seventeenth Amendment to the U.S. Constitution does not allow the proposed change to be made by initiative. Trust the People and the *amicus* respond that pre-election review of the initiative is premature and that we should only determine its constitutionality if the proposal is adopted at the election. The state rejects this contention, arguing that pre-election judicial review is appropriate because, it claims, the initiative violates the Seventeenth Amendment. Because we conclude that pre-election judicial review may extend only to subject matter restrictions that arise from a provision of Alaska law that expressly addresses and restricts Alaska's constitutionally-established initiative process or to proposals that are clearly unlawful under controlling authority, we agree with Trust the People and the *amicus* that pre-election review is not appropriate in this case. Accordingly, we affirm

---

**45.** *Id.* at 743 (Erwin, J., dissenting).

**46.** The minutes of the Senate State Affairs Committee's March 18, 2004 discussion of H.B. 414 indicate that Senator Gretchen Guess proposed an amendment that would have prevented a governor's temporary senate appointment from standing for reelection in a subsequent special

election. Senator Guess explained that she was "worried that the temporary appointee has an incumbency advantage," and that this would be "at odds with the intent" of the initiative, "which is to make a clean process that is separate from an appointment." The amendment failed.

the decision of the superior court holding that the lieutenant governor could not engage in pre-election review of the Seventeenth Amendment issue.

As we have recognized on other occasions, "articles XI and XII are the only provisions of the Alaska Constitution that explicitly mention the initiative process."[47] Specifically, article XI, section 7, describes certain express subject-matter restrictions:

> The initiative shall not be used to· dedicate revenues, make or repeal·appropriations, create courts, define the jurisdiction of courts or prescribe their rules, or enact local or special legislation.[48]

Article XII, section 11, in turn, specifies that the electorate's power to legislate by initiative is always "subject to" these express restrictions; section 11 also more generally recognizes that the initiative process may be implicitly restricted by other provisions, but only if such provisions make the process "clearly inapplicable":

> Unless clearly inapplicable, the lawmaking powers assigned to the legislature may be exercised by the people through the initiative, subject to the limitations of Article XI.[49]

These provisions largely define the permissible scope of pre-election subject-matter review in Alaska.[50] Early on, in Boucher v. Engstrom,[51] we approvingly noted "the general rule that courts will refrain from giving advisory opinions on the constitutionality of statutes," but recognized that an exception to this principle would apply "in regard to review of initiatives prior to submission to the electorate for approval."[52] As we expressly described it in Boucher, this exception applied to a limited set of challenges:

> This court, ... although recognizing the general limitation that only enacted legislation is subject to judicial review, [has] held that our courts are empowered to 'review an initiative to ascertain whether it complies with the particular constitutional and statutory provisions regulating initiatives.[53]

We stressed that it was necessary to apply the exception to this set of challenges in order to enforce the meaning of the initiative process as set out in Alaska's constitution. We said:

> The people for their own protection have provided that the initiative shall not be employed with respect to certain matters. Unless the courts had power to enforce those exclusions, they would be futile.[54]

In initiative cases decided since Boucher, we have consistently restated the language of Boucher that limits pre-election review to

**47.** Brooks v. Wright, 971 P.2d 1025, 1027 (Alaska 1999).

**48.** Alaska Const., art. XI, § 7. These restrictions are mirrored in AS 15.45.010.

**49.** Alaska Const., art. XII, § 11 (emphasis added). See also Brooks, 971 P.2d at 1028–29 (describing constitutional history of section 11 as indicating that its "clearly 'inapplicable" language meant that initiative process was inapplicable only when "55 idiots would agree that it was inapplicable").

**50.** There is an additional basis for pre-election review in Alaska, not argued in the case before us: "[G]eneral contentions that the provisions of an initiative are unconstitutional" may be considered pre-election "only ... if 'controlling authority' leaves no room for argument about its unconstitutionality," Alaska Action Ctr., Inc. v. Municipality of Anchorage, 84 P.3d 989, 992 (Alaska 2004) (quoting Kodiak Island Borough v. Mahoney, 71 P.3d 896, 900 (Alaska 2003)) and Brooks, 971 P.2d at 1027. We provided an example of the type of clearly controlling authority that might allow a proposed initiative to be removed from the ballot: "The initiative's substance must be on the order of a proposal that would 'mandat[e] local school segregation based on race' in violation of Brown v. Bd. of Educ. before the clerk may reject it on constitutional grounds." Alaska Action Ctr., 84 P.3d at 992 ·(citations omitted). In this case, the state concedes that the provisions of the proposed initiative would be "perfectly constitutional and above reproach" if enacted by the legislature.

**51.** 528 P.2d 456 (Alaska 1974) overruled on other grounds by McAlpine v. Univ. of Alaska, 762 P.2d 81 (Alaska 1988).

**52.** Boucher, 528 P.2d at 460.

**53.** Id. (citing Walters v. Cease, 394 P.2d 670 (Alaska 1964); Starr v. Hagglund, 374 P.2d 316 (Alaska 1962)) (emphasis added).

**54.** Id. (quoting Bowe v. Sec'y of the Commonwealth, 320 Mass. 230, 69 N.E.2d 115, 128 (1946)).

cases involving compliance with "the particular constitutional and statutory provisions regulating initiatives." [55] Most recently, in *Alaska Action Center, Inc. v. Municipality of Anchorage,*[56] referring to this type of challenge, we stressed that "[s]eparation of powers principles are not offended by this procedure, as these restrictions were devised to prevent certain questions from going before the electorate at all." [57]

*Alaska Action Center* involved a challenge to a municipal clerk's decision rejecting a proposed initiative on the ground that it provided for an appropriation, in violation of article XI, section 7, and AS 29.26.100. In deciding the claim, we expressly followed the conventional rule that an initiative may be reviewed before going to the voters to ensure compliance with "the particular constitutional and statutory provisions regulating initiatives." [58] Finding that "[t]he proscriptions of AS 29.26.100 and article XI, section 7 of the Alaska Constitution are such limitations," we concluded that pre-election review was proper.[59] Thus, *Alaska Action Center* simply applied the test articulated in *Boucher.* To be sure, *Alaska Action Center* distinguished this kind of reviewable "subject-matter" challenge from "[o]ther challenges . . . grounded in 'general contentions that the provisions of an initiative are unconstitutional.' " [60] But this distinction simply describes a baseline for pre-election review; although it usefully points out that pre-election review of an initiative proposal usually involves a subject-matter challenge—as opposed to a general claim of substantive illegality—it does not say that all subject-matter challenges must automatically qualify for full pre-election review.

By consistently pointing out that pre-election review is needed to ensure compliance with "the particular constitutional and statutory provisions regulating initiatives"—that is, with those restrictions specifically "devised to prevent certain questions from going before the electorate"—our cases · establish that pre-election review does not encompass all potential subject-matter restrictions, but extends only to the restrictions imposed by Alaska constitutional and statutory provisions regulating the initiative process. So interpreted, our cases make pre-election review appropriate to ensure compliance with the express initiative restrictions set out in article XI, section 7. Our cases similarly allow pre-election review, under article XII, section 11, to ensure compliance with subject-matter restrictions set out in other legal provisions; but under the express terms of article XII, section 11, the scope of review would be limited to cases of obvious non-compliance—cases where the initiative process would be "clearly inapplicable." [61]

By contrast, the state argues that our cases stand for the proposition that whenever the issue is whether voters can enact the law by initiative, it is appropriate for pre-election review. The state thus argues for a broad rule that would allow a full range of pre-election review of all subject-matter challenges, "regardless of the source of the restriction." In arguing that full pre-election review is appropriate for even those subject-matter challenges "not enumerated in Alaska law," the state overlooks the limiting language noted above that we have employed in several cases.

The state argues that we reviewed the constitutionality of an initiative prior to its placement on the ballot in *Yute Air Alaska, Inc. v. McAlpine.*[62] Challengers to the initiative in *Yute Air* argued that the initiative

**55.** *See, e.g., Brooks,* 971 P.2d at 1027 (quoting *Boucher*); *Alaska Action Ctr.,* 84 P.3d at 992 (quoting *Brooks'*s quotation from *Boucher*); *Whitson v. Anchorage,* 608 P.2d 759, 761–62 (Alaska 1980).

**56.** 84 P.3d 989.

**57.** *Id.* at 992.

**58.** *Id.*

**59.** *Id.* at 993.

**60.** *Id.* at 992 (quoting *Brooks,* 971 P.2d at 1027).

**61.** *See, e.g., Kodiak Island Borough v. Mahoney,* 71 P.3d 896, 900 (Alaska 2003) (comparing section 11's "clearly inapplicable" requirement to stringent test applicable when executive order declares statute unconstitutional); *Brooks,* 971 P.2d at 1029 (describing section 11's "clear idiot" test).

**62.** 698 P.2d 1173 (Alaska 1985).

was unconstitutional because it concerned two subjects, which violated article II, section 13 of the Alaska Constitution which requires that every bill be confined to one subject;[63] they also argued that the initiative directed the executive to seek repeal of the Jones Act, and was thus unconstitutional because it was not a proper subject for an initiative under article XI, section 1 of the Alaska Constitution, which limits the use of the initiative to the enactment of laws.[64] We resolved these questions on the merits before the initiative was placed on the ballot.[65] The state argues that because we reviewed an initiative to determine if it violated a subject matter limitation not enumerated in article XI, section 7 of the Alaska Constitution in *Yute Air*, we should now likewise determine whether the people are restricted from enacting by initiative legislation on the subject of filling of senate vacancies before the election. But unlike the challenge raised here, which alleges that the Federal Constitution prohibits enactment by initiative, the challenge to the initiative in *Yute Air* concerned two limitations placed on the initiative process by the Alaska Constitution. Thus, pre-election review in *Yute Air* did not violate our holding in *Boucher v. Engstrom* that such review should be limited to ascertaining whether an initiative is in compliance with constitutional provisions that regulate legislative enactment via initiative.[66]

The state also relies on *Alaskans for Legislative Reform v. State*,[67] in which an initiative that would have imposed term limits on legislators was denied a place on the ballot. We note at the outset that no party in that case opposed pre-election review. As Judge Shortell noted in his opinion (adopted by this court), the issue was not raised at the trial level because "both parties [had] the intention of obtaining pre-election dispositive re-

view."[68] It appears that there was no consideration by any court at any level of the question whether pre-election review was proper. Second, to the extent that *Alaskans for Legislative Reform* supports pre-election review of claims that a term limits initiative is unconstitutional, it appears to have been overruled by *Kodiak Island Borough v. Mahoney*,[69] where we declined to allow pre-election review of a term-limits proposal.[70] Finally, since Judge Shortell ordered the initiative removed from the ballot, the case was clearly ripe for immediate review;[71] indeed, the only way for this court to avoid pre-election review would have been to declare *sua sponte* that Judge Shortell erred in addressing the constitutional issue.

The state also relies on *Brooks v. Wright*,[72] arguing that it raised a subject-matter claim that was subject to pre-election review. But for present purposes, it is crucial to take account of the exact nature of the claim raised in *Brooks*. The case involved an initiative proposing to ban all use of wolf snares. The challengers alleged that article VIII of the Alaska Constitution did not allow the initiative process to be used for game-management purposes because the language of that constitutional provision and the provision's grant of trustee-like powers to the state implicitly gave the legislature exclusive authority to manage Alaska's natural resources.[73] But while basing their pre-election challenge on this constitutional theory, the initiative's opponents did not actually seek review of their article VIII claim, as such. Instead, they argued more narrowly that the implied subject-matter restriction imposed by article VIII violated the "clearly inapplicable" test of article XII, section 11: "under Article XII, the initiative process is 'clearly inapplicable' to resource management

63. *Id.* at 1175.

64. *Id.*

65. *Id.* at 1177.

66. 528 P.2d 456, 460 (Alaska 1974).

67. 887 P.2d 960 (Alaska 1994).

68. *Id.* at 962 n. 6.

69. 71 P.3d 896 (Alaska 2003).

70. *Id.* at 897.

71. *Alaskans for Legislative Reform,* 887 P.2d at 966.

72. 971 P.2d 1025 (Alaska 1999).

73. *Id.* at 1027–29.

decisions[.]" [74] So asserted, the challenge in *Brooks* did more than claim a "subject-matter" restriction embedded in article VIII; it further asserted that this restriction implicated one of the Alaska Constitution's "particular" provisions governing the proper scope of initiatives: article XII.

Our opinion in *Brooks* resolved the constitutional claim by applying article XII, section 11's "clearly inapplicable" test. Our opinion acknowledged that "[p]re-election review of challenges to ballot initiatives is limited to ascertaining 'whether [the initiative] complies with the particular constitutional and statutory provisions regulating initiatives' " [75] and that "[a]rticles XI and XII are the only provisions of the Alaska Constitution that explicitly mention the initiative process." [76] After noting that the challengers did not claim a violation of "one of the enumerated Article XI limitations," we took pains to point out that they argued, instead, that the initiative process was " 'clearly inapplicable' to resource management decisions" under article XII. [77] We then applied the article XII standard and concluded that neither prong of the challengers' claim that article VIII impliedly restricted using the initiative process to ban wolf snares was sufficiently persuasive to establish that the proposed wolf-snare ban was " 'clearly inapplicable' to the initiative process under Article XII." [78]

*Brooks* thus based its ruling on the article VIII issue by using article XII's "clearly inapplicable" standard. By so doing, it treated the claim as a permissible pre-election challenge under the narrow rule enunciated in *Boucher*, which, as already mentioned, expressly limits the scope of pre-election review to "particular constitutional [or] statutory provisions regulating initiatives." Thus, *Brooks* strongly supports the rule that when an alleged subject-matter violation hinges on an implied constitutional restriction outside the specific restrictions enumerated in article XI, section 7—as the challenge did in *Brooks*—it is eligible for pre-election review only if it meets article XII, section 11's "clearly inapplicable" test.

The state also relies on *Whitson v. Anchorage*. [79] But that case supports the conclusion that pre-election review is not appropriate here. In *Whitson*, the Municipality of Anchorage challenged an initiative in court before submitting it to the voters. The municipality contended that, if enacted, the proposed initiative would violate provisions of state law implicitly limiting the electorate's right to enact an ordinance on the topic covered by the proposed initiative. [80] In opposing this challenge, the initiative's proponents argued that the challenge was premature and could not be decided before the election. But we disagreed, specifically concluding that the provision qualified for pre-election review because it "plainly ... would conflict" with state law and was "in clear conflict with a state statute." [81] *Whitson* thus illustrates an application of the clear "controlling authority" exception to the general rule against pre-enactment review that we referred to in *Alaska Action Center*. [82]

In sum, a narrow interpretation of the permissible scope of pre-election review is faithful to our case law, [83] is supported by the strong policies that generally disfavor advisory opinions, and is justified by the limited purpose of pre-election review—to protect the Alaska Constitution's express provisions defining the initiative process. [84] Because the

**74.** *Id.*

**75.** *Id.* at 1027 (citing *Boucher*, 528 P.2d at 460).

**76.** *Id.*

**77.** *Id.*

**78.** *Id.* at 1030, 1033.

**79.** 608 P.2d 759 (Alaska 1980).

**80.** *Id.* at 761.

**81.** *Id.* at 761–62.

**82.** 84 P.3d 989, 992 (Alaska 2004). *See* discussion *supra* note 50.

**83.** *See, e.g., Brooks*, 971 P.2d at 1027 (quoting *Boucher*, 528 P.2d at 460 *overruled on other grounds by McAlpine v. Univ. of Alaska*, 762 P.2d 81 (Alaska 1988)); *Alaska Action Ctr.*, 84 P.3d at 992 (quoting *Brooks* 's quotation from *Boucher* ).

**84.** *Boucher*, 528 P.2d at 460. *See also Citizens for Tort Reform v. McAlpine*, 810 P.2d 162, 168–70 (Alaska 1991).

subject matter at issue here—filling senate vacancies—is not specifically barred from the initiative process under article XI, section 7, nor "clearly inapplicable" under article XII, section 11, nor is its resolution clear under controlling authority, we conclude that the proposed initiative meets the test for submission to the voters. Its ultimate compliance with the Seventeenth Amendment falls outside the proper scope of the lieutenant governor's pre-election review.

## V. CONCLUSION

Because H.B. 414 is not "substantially the same" as 03SENV, the initiative is not void under the Alaska Constitution. Because the state's Seventeenth Amendment argument does not involve a subject matter restriction arising from a provision of Alaska law that expressly addresses and restricts Alaska's constitutionally-established initiative process or a proposal that is clearly unlawful under controlling authority, we AFFIRMED the superior court's decision to deny pre-election review of the Seventeenth Amendment issue.

For these reasons, we directed the lieutenant governor to place Trust the People's initiative, 03SENV, on the general election ballot.